THE STATE OF OHIO, APPELLEE, *v.* FITZPATRICK, APPELLANT.

[Cite as *State v. Fitzpatrick,* 102 Ohio St.3d 321, 2004-Ohio-3167.]

(No. 2002–0506—Submitted March 30, 2004—Decided July 7, 2004.)

O'CONNOR, J.

{¶ 1} Appellant, Stanley Fitzpatrick, murdered his girlfriend, Doreatha Hayes, her 12–year–old daughter Shenay, and a neighbor, Elton Rose. While leaving the crime scene, he attempted to kill a police officer. Fitzpatrick pleaded guilty to three counts of aggravated murder with death specifications. He appeals his convictions and death sentence.

{¶ 2} Prior to the murders, Fitzpatrick lived with Doreatha and Shenay Hayes at 867 Chicago Avenue in the village of Lincoln Heights. On Thursday, June 7, 2001, Fitzpatrick killed Shenay and Doreatha. On June 10, 2001, he confessed these crimes to his cousin Marvin Thomas.

{¶ 3} Fitzpatrick told Thomas that 12–year–old Shenay had come home and caught him smoking crack. Fitzpatrick claimed that Shenay had attacked him with a knife and was accidentally stabbed in the ensuing altercation. The coroner later testified that Shenay had been stabbed three times in the back of the neck and once near her ear.

{¶ 4} As Shenay gasped for breath, Fitzpatrick ran into the next room. A few minutes later, he came back and struck Shenay repeatedly in the head with an ax handle, fracturing her skull, "so that he wouldn't hear the sounds that she was making." At some point, Fitzpatrick wrapped a ligature around Shenay's neck. Nevertheless, according to Fitzpatrick, she was still "making sounds" when Fitzpatrick wrapped her in a blanket and a carpet and put her in a bedroom closet. Shenay died of the combined effect of the stab wounds, blows to the head, and strangulation.

{¶ 5} Later that evening, Fitzpatrick beat Doreatha Hayes to death. He told Marvin Thomas that, after Doreatha came home, "we got into it as usual." Fitzpatrick said that during the argument, he hit her in the head with an ax handle or an ax. She fell to the floor, and he hit her repeatedly in the face. When Doreatha stopped making noises, Fitzpatrick moved her body to another bedroom and placed a mattress on top of it.

{¶ 6} An autopsy showed that Doreatha had at least 13 "chop wounds": five on her head, five on her left forearm, one on her right wrist, and one on each hand. Doreatha's wounds were consistent with her having been struck with State's Exhibit 12, a hatchet that police later found in the basement of 867 Chicago Avenue. Blood on the hatchet, and on a hammer also found at 867 Chicago Avenue, had a DNA profile matching Doreatha's.

{¶ 7} At approximately 10:30 p.m. on June 9, Fitzpatrick walked across Chicago Avenue and rang the doorbell of Elton and Betty Rose. Looking through the window, Mrs. Rose recognized Fitzpatrick standing on her front porch, and, calling through the door, she asked him what he wanted. Fitzpatrick said, "[I]t's Doreatha's boyfriend. * * * Doreatha would like to see your husband. She said to tell him to come over to the house." Mrs. Rose summoned her husband, Elton Rose ("Rose"). Rose went across the street with Fitzpatrick and entered 867 Chicago Avenue, where Fitzpatrick killed him.

{¶ 8} Rose died from lacerations of the brain caused by blunt-impact injuries to his head. He sustained numerous lacerations and skull fractures caused by at least ten separate blows to the back and right side of his head. These injuries were consistent with Rose having been struck with the blunt side of State's Exhibit 12, the hatchet. Blood on the hatchet had a DNA profile consistent with Rose's.

{¶ 9} Five or ten minutes after he had left with Rose, Fitzpatrick rang the Roses' doorbell again. He told Mrs. Rose, "[Y]our husband wants you to come across the street." When Mrs. Rose asked why, Fitzpatrick had no answer, and Mrs. Rose did not believe him, so she said, "[G]o tell my husband to come to the door."

{¶ 10} Fitzpatrick turned away from Mrs. Rose. He appeared to be "looking around * * * to see if there was anyone watching him." Suddenly, he "took off," back across the street.

{¶ 11} Just then, at 10:50 p.m., Sergeant Deangelo Sumler of the Lincoln Heights Police Department drove up in his cruiser. Sumler had been dispatched to 867 Chicago Avenue in response to a "silent 911" call. Sumler saw Mrs. Rose and noted that she looked "distraught," so he pulled over to talk to her.

{¶ 12} Mrs. Rose pointed out Fitzpatrick standing on the sidewalk in front of 867 Chicago Avenue. Fitzpatrick approached Sumler and said, "[C]ome on in, he needs some help." Sumler asked Mrs. Rose what was going on. She replied, "[M]y husband is over there." Fitzpatrick repeated that "he needed some help" and ran inside 867 Chicago Avenue. Sumler followed Fitzpatrick into the house.

{¶ 13} When he went in, Sumler saw Fitzpatrick pointing a .38-caliber revolver at him. Although Sumler had not drawn his gun, Fitzpatrick told him to drop it.

Sumler raised his hands. He then backed up to the door, pushed it open, and ran outside. Fitzpatrick fired twice at Sumler.

{¶ 14} Sumler sought cover behind a large metal trash container. Fitzpatrick came out, aimed at Sumler, and fired a third shot. Sumler fired back. Fitzpatrick then got into Sumler's cruiser and drove off.

{¶ 15} Fitzpatrick abandoned the stolen cruiser after driving into some bushes. He then entered the home of Montika Pitts. When Pitts encountered him inside her home, she asked what he wanted. Fitzpatrick's response was to scream at Pitts and then grab her throat. They scuffled, and Fitzpatrick shoved Pitts outside. When Pitts re-entered her home, to protect her child, who was asleep in the house, Fitzpatrick fled. Later, Fitzpatrick robbed Marjorie Duff of her car at knifepoint. He then fled in Duff's car, which was later found abandoned in Cincinnati.

{¶ 16} As mentioned previously, on June 10, 2001, Fitzpatrick confessed to committing the murders to his cousin Marvin Thomas. Thomas then called the Hamilton County Sheriff's Department. He told a detective that Fitzpatrick was in a motel in Sharonville, Ohio.

{¶ 17} Police officers went to Fitzpatrick's motel room and spoke with him through the door. Fitzpatrick eventually surrendered. Duff's car keys were found in Fitzpatrick's room.

{¶ 18} Later that day, Detective Patrick Dilbert interviewed Fitzpatrick at the Hamilton County Sheriff's Department. Fitzpatrick waived his *Miranda* rights and agreed to speak with Dilbert. Fitzpatrick told Dilbert that "he'd been up for several days smoking crack," that he lived at 867 Chicago Avenue, and that he had been either fired, suspended, or placed on probation by his employer on June 5.

{¶ 19} A grand jury indicted Fitzpatrick on one count of aggravated murder under R.C. 2903.01(C) (child murder) and two counts of aggravated murder under R.C. 2903.01(A) (prior calculation and design). Each aggravated murder count carried a single death specification. The specification to Count One (the Shenay Hayes murder) alleged that Fitzpatrick had purposefully caused the death of a person who was under the age of 13 and that Fitzpatrick had been the principal offender. See R.C. 2929.04(A)(9). The specification to Count Two (Doreatha Hayes) alleged that the murder was part of a course of conduct involving the purposeful killing of or attempt to kill two or more people. See R.C. 2929.04(A)(5). The specification to Count Three (Elton Rose) also alleged a course of conduct. The indictment also included one count of attempted murder (Deangelo Sumler), two counts of aggravated robbery (Sumler's cruiser and Marjorie Duff's car), and one count of aggravated burglary (Montika Pitts's residence).

{¶ 20} Fitzpatrick initially pleaded not guilty. He requested a jury trial, and a jury was seated. However, during the defense's opening statement, Fitzpatrick decided to change his plea to guilty. Counsel recommended against a guilty plea, but Fitzpatrick told counsel that if they did not stop the proceedings, he would.

{¶ 21} Fitzpatrick's remarks to the trial judge made clear his insistence on pleading guilty:

{¶ 22} "What I told you, I want it done. I don't want to wait till no lunch or the next day or nothing.

{¶ 23} "* * *

{¶ 24} "I told them what I wanted to happen, and that save you some tax money or whatever, you know. * * * Seriously. Tell the jury or whatever, they don't have to go through this, be cut right down. * * * You ain't got to sit here and put my family through this * * *, you know.

{¶ 25} "* * *

{¶ 26} "This is—just make it over with, man.

{¶ 27} "* * *

{¶ 28} "I just told you what I wanted to do. I plead guilty. I killed them, but I don't remember what happened to Doreatha and Shenay."

{¶ 29} Defense counsel informed the court that the defense had discussed Fitzpatrick's competence with two psychiatrists and a psychologist, and had reviewed medical records from two other psychiatrists. The defense was unable to find any basis to assert that Fitzpatrick was incompetent.

{¶ 30} After Fitzpatrick signed a jury waiver, the jury was discharged and a three-judge panel was selected. The panel went over each count in the indictment with Fitzpatrick, explaining the maximum sentence for each charge. The court explained to him that by pleading guilty, he would waive his rights to a jury trial, to confront witnesses before a jury, to present witnesses in the guilt phase, and to hold the state to its burden of proving guilt beyond a reasonable doubt to a jury, and his privilege against self-incrimination. The court noted that Fitzpatrick would be entitled to confront witnesses that testified for the prosecution, present witnesses in a penalty phase (if there was one), and that the prosecution would have to prove to the three–judge panel that he was guilty beyond a reasonable doubt of the aggravated murders and specifications. Fitzpatrick said he understood the court's explanations, had consulted with his counsel, was satisfied with his counsel's work, and wished to plead guilty. The court then allowed him to withdraw his earlier plea and enter a plea of guilty to all counts and specifications in the indictment.

{¶ 31} The state then presented evidence, as required by R.C. 2945.06 ("If the accused pleads guilty of aggravated murder, a court composed of three judges

shall examine the witnesses, determine whether the accused is guilty of aggravated murder or any other offense, and pronounce sentence accordingly"). See *State v. Green* (1998), 81 Ohio St.3d 100, 689 N.E.2d 556. Witnesses included Detective Dilbert, Sergeant Sumler, Betty Rose, Montika Pitts, Marjorie Duff, and Dr. Robert Pfalzgraf, Chief Deputy Coroner of Hamilton County. Also testifying were Anthony Barner, who was Shenay Hayes's father, and Deputy Sheriff David Linder, an evidence technician.

{¶ 32} The panel found Fitzpatrick guilty of all charges and specifications. The panel then held a mitigation hearing. The state reintroduced its evidence from the plea hearing. Fitzpatrick presented three witnesses and made an unsworn statement, and the state called one rebuttal witness. After the mitigation hearing, the panel sentenced Fitzpatrick to death.

{¶ 33} Fitzpatrick appealed from the judgment and sentence to this court as an appeal as of right.

## I. Validity of Jury Waiver

{¶ 34} In his first proposition of law, Fitzpatrick contends that his waiver of his right to a jury trial was not voluntary and intelligent, and was hence invalid, because the trial court did not sufficiently inform him of the features of a jury trial.

{¶ 35} Fitzpatrick signed a jury waiver, which was filed and journalized and is in the record. See *State v. Pless* (1996), 74 Ohio St.3d 333, 658 N.E.2d 766, paragraph one of the syllabus (waiver of right to trial by jury must be in writing, signed by the defendant, filed, and made part of the record). The written waiver contains the following acknowledgement: "I fully understand that under the laws of this State, I have a constitutional right to a trial by jury to determine my guilt or innocence and further to decide the appropriate penalty in this matter."

{¶ 36} After Fitzpatrick signed the waiver, the trial court questioned him. When asked, Fitzpatrick confirmed that he had not been subjected to duress and that he had read the waiver form, discussed his decision with counsel, and had no questions. He affirmed that he had signed the waiver voluntarily and that he wanted to waive his right to a jury trial and have the case tried to a three-judge panel. Fitzpatrick's counsel informed the court that Fitzpatrick had taken a medication that "helps him actually to think more clearly and to sleep better." Fitzpatrick stated that the medication did not interfere with his ability to understand the waiver form or the proceedings.

{¶ 37} A jury waiver must be voluntary, knowing, and intelligent. Crim.R. 23; *State v. Ruppert* (1978), 54 Ohio St.2d 263, 271, 8 O.O.3d 232, 375 N.E.2d 1250. Waiver may not be presumed from a silent record. However, if the record shows a jury waiver, the conviction will not be set aside except on a plain showing that

the defendant's waiver was not freely and intelligently made. *Adams v. United States ex rel. McCann* (1942), 317 U.S. 269, 281, 63 S.Ct. 236, 87 L.Ed. 268. Moreover, a written waiver is presumptively voluntary, knowing, and intelligent. *United States v. Sammons* (C.A.6, 1990), 918 F.2d 592, 597. See, generally, *State v. Bays* (1999), 87 Ohio St.3d 15, 19, 716 N.E.2d 1126.

{¶ 38} Nothing in the record suggests that Fitzpatrick's jury waiver was involuntary. When the trial court accepted Fitzpatrick's written waiver, Fitzpatrick affirmed that his decision was voluntary. He also affirmed that his counsel had reviewed the waiver form with him and that he had discussed his decision with them. A defendant's having had the advice of counsel is a factor supporting a finding of voluntariness. *Bays*, 87 Ohio St.3d at 19, 716 N.E.2d 1126.

{¶ 39} Although Fitzpatrick was on medication when he executed the waiver, he denied that the medication interfered with his ability to understand the waiver form or the proceedings. Nothing in the record contradicts this. (When Fitzpatrick entered his guilty plea two days later, he stated, "[The medication] [s]tops me from hearing voices and seeing things.")

{¶ 40} Importantly, Fitzpatrick's decision to waive a jury trial followed from his decision to plead guilty. When a defendant pleads guilty to aggravated murder, a three-judge panel must determine whether he is guilty. R.C. 2945.06. It is clear from the record that his decision to plead guilty was voluntary: Fitzpatrick initiated that decision, insisted upon it against advice of counsel, and held to it through a lengthy plea colloquy.

{¶ 41} Fitzpatrick's written waiver is presumed to have been voluntarily made. *Sammons*, 918 F.2d 592. He has failed to overcome that presumption: he makes no showing that his waiver was involuntary. *Adams*, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268. Accordingly, we hold that it was voluntary.

{¶ 42} Fitzpatrick contends that his waiver was not knowing and intelligent, because the trial court did not advise him that a jury's verdict must be unanimous, both to convict and to impose the death penalty.

{¶ 43} "A waiver is the intentional relinquishment of a known right or privilege. * * * Hence, a defendant must have some knowledge of the nature of the jury trial right to make a valid waiver." *Bays*, 87 Ohio St.3d at 19–20, 716 N.E.2d 1126. However, "[t]here is no requirement for a trial court to interrogate a defendant in order to determine whether he or she is fully apprised of the right to a jury trial." *State v. Jells* (1990), 53 Ohio St.3d 22, 559 N.E.2d 464, paragraph one of the syllabus; accord *Spytma v. Howes* (C.A.6, 2002), 313 F.3d 363, 370 (colloquy not constitutionally required). "The Criminal Rules and the Revised Code are satisfied by a written waiver, signed by the defendant, filed with the

court, and made in open court, after arraignment and opportunity to consult with counsel." *Jells*, 53 Ohio St.3d at 26, 559 N.E.2d 464.

{¶ 44} Moreover, a defendant need not have a complete or technical understanding of the jury-trial right in order to waive it. *United States v. Martin* (C.A.6, 1983), 704 F.2d 267, 273. According to the Sixth Circuit, "[a] defendant is sufficiently informed to make an intelligent waiver if he was aware that a jury is composed of 12 members of the community, he may participate in the selection of the jurors, the verdict of the jury must be unanimous, and * * * a judge alone will decide guilt or innocence should he waive his jury trial right." Id. Furthermore, *Martin*'s "statement that this knowledge is *sufficient* is not, of course, equivalent to a statement that it is constitutionally required." (Emphasis sic.) *United States v. Sammons*, supra, 918 F.2d at 597.

{¶ 45} Fitzpatrick relies on an unreported United States District Court opinion, *Sowell v. Anderson* (Oct. 5, 2001), S.D.Ohio E.D. No. C-1-94-237, 2001 WL 1681142. In *Sowell*, the district court stated: "The Sixth Circuit has held that in order for a jury waiver to be knowing and intelligent as a matter of constitutional law, the record *must* reflect *at a bare minimum* the following understandings on the part of the defendant: that the jury is composed of twelve members of the community, that the defendant may participate in the selection of the twelve jurors, *that any verdict rendered by the jury must be unanimous,* and that a judge alone will decide guilt or innocence if a jury trial is waived. Both *Sammons* and *Martin* require that a defendant be aware of and understand that any verdict returned by a jury must be unanimous." (Emphasis added.) *Sowell v. Anderson,* slip op. at 26–27.

{¶ 46} We respectfully disagree with the district court's reading of *Sammons* and *Martin*. Neither case "require[s]" that the record show that the defendant specifically understood the unanimity requirement. *Martin* recognized that a defendant's awareness of certain features of a jury trial, including unanimity, is *sufficient* knowledge for a knowing and intelligent jury waiver. Id., 704 F.2d at 273. But the court did not say that this knowledge was a constitutional minimum for a knowing and intelligent waiver. Furthermore, the *Martin* court *recommended* that trial courts advise defendants, on the record, of those features, but it refused to *require* such notification. Id. at 274–275.

{¶ 47} *Sammons* clarifies this point: "The statement [in *Martin*] that this knowledge is *sufficient* is not, of course, equivalent to a statement that it is constitutionally required. In fact, [the United States Court of Appeals for] the Seventh Circuit has held that a defendant who 'understood that the choice confronting him was, on the one hand, to be judged by a group of people from the community, and on the other hand, to have his guilt or innocence determined by a judge' had knowingly and intelligently waived his right to a trial by jury."

(Emphasis sic.) *Sammons,* 918 F.2d at 597, quoting *United States ex rel. Williams v. DeRobertis* (C.A.7, 1983), 715 F.2d 1174, 1180.

{¶ 48} It is clear that Fitzpatrick understood that the choice confronting him was whether to be judged by a group of people from the community or by a panel of judges. As a jury had already been chosen in Fitzpatrick's presence, it is evident that he knew that a jury is a group of people from the community. And the written waiver he signed expressly states: "I * * * elect to be tried by three (3) Judges of the Court of Common Pleas."

{¶ 49} Fitzpatrick also claims that the colloquy was constitutionally deficient because he was not advised that he was entitled to a jury of 12 or that he had a right to participate in the selection of the jury. However, as we have already noted, there is no constitutional requirement for a colloquy. *Jells,* 53 Ohio St.3d 22, 559 N.E.2d 464. In any event, there was no need to advise Fitzpatrick of these points because at the time that he decided to waive a jury trial, a jury of 12 had already been impaneled in his presence and he had participated in its selection.

{¶ 50} We overrule Fitzpatrick's first proposition of law.

## II. Validity of Guilty Plea

{¶ 51} In his second proposition of law, Fitzpatrick contends that his guilty plea was not voluntary, knowing, and intelligent, because the plea colloquy was inadequate.

{¶ 52} "Prior to accepting a guilty plea from a criminal defendant, the trial court must inform the defendant that he is waiving his privilege against compulsory self-incrimination, his right to jury trial, his right to confront his accusers, and his right of compulsory process of witnesses." *State v. Ballard* (1981), 66 Ohio St.2d 473, 20 O.O.3d 397, 423 N.E.2d 115, paragraph one of the syllabus, following *Boykin v. Alabama* (1969), 395 U.S. 238, 242, 89 S.Ct. 1709, 23 L.Ed.2d 274. See, also, Crim.R. 11(C)(2)(c).

{¶ 53} In this case, the trial court complied with *Ballard* and Crim.R. 11(C)(2)(c) by informing Fitzpatrick that by pleading guilty, he would waive his privilege against self-incrimination and his rights to confront the state's witnesses before a jury, to subpoena witnesses for the guilt phase, to a jury trial, and to require the state to prove to a jury that he was guilty beyond a reasonable doubt.

{¶ 54} Nevertheless, Fitzpatrick contends that his plea was not voluntary, knowing, and intelligent, because the trial court did not inform him that the verdict of a three-judge panel must be unanimous as to conviction or acquittal. See R.C. 2945.06. However, the right to a unanimous verdict by a judicial panel in a bench trial is not a constitutional right; it is conferred by R.C. 2945.06. Because that right is not a constitutional right, a trial court need not advise a

defendant that he waives it by pleading guilty. See, generally, *Libretti v. United States* (1995), 516 U.S. 29, 49–51, 116 S.Ct. 356, 133 L.Ed.2d 271.

{¶ 55} Fitzpatrick further contends that his plea was not knowing and intelligent, because the trial court did not, as required by Crim.R. 11(C)(2)(a), ensure that he made the plea "with understanding of the nature of the charges." Fitzpatrick claims that the trial court should have explained to him the legal definitions of "purposely" and "prior calculation and design."

{¶ 56} "A plea may be involuntary either because the accused does not understand the nature of the constitutional protections he is waiving * * * or because he has such an incomplete understanding of the charge that his plea cannot stand as an intelligent admission of guilt." *Henderson v. Morgan* (1976), 426 U.S. 637, 645, 96 S.Ct. 2253, 49 L.Ed.2d 108, fn. 13. In determining whether a defendant understood the charge, a court should examine the totality of the circumstances. *Henderson* at 644, 96 S.Ct. 2253, 49 L.Ed.2d 108; *State v. Rainey* (1982), 3 Ohio App.3d 441, 442, 3 OBR 519, 446 N.E.2d 188.

{¶ 57} However, "[t]he courts of this state have generally held that a detailed recitation of the elements of the charge is not required under Crim.R. 11(C)(2)(a)." *State v. Swift* (1993), 86 Ohio App.3d 407, 621 N.E.2d 513, citing *Rainey*; accord *State v. Krcal*, 8th Dist. No. 80061, 2002-Ohio-3634, 2002 WL 1587839, at ¶ 25. Moreover, the Constitution does not require that a trial court explain the elements of the charge, at least where the record contains a representation by defense counsel that the nature of the offense has been explained to the accused. See *Henderson*, 426 U.S. at 647, 96 S.Ct. 2253, 49 L.Ed.2d 108. See 5 LaFave, Israel & King, Criminal Procedure (2d Ed.1999) 164, Section 21.4(c). "Apart from the small class of rights that require specific advice from the court under Rule 11(c), it is the responsibility of defense counsel to inform a defendant of * * * the attendant statutory and constitutional rights that a guilty plea would forgo." *Libretti*, 516 U.S. at 50–51, 116 S.Ct. 356, 133 L.Ed.2d 271. Fitzpatrick does not claim that his counsel rendered ineffective assistance in this regard.

{¶ 58} In this case, the record contains a representation by defense counsel that they had explained the charged offenses to Fitzpatrick. At the end of Fitzpatrick's written guilty plea is the following statement, which was signed by his counsel: "We have explained to the Defendant, STANLEY L. FITZ-PATRICK, prior to his signing this plea, the charge(s) in the indictment, the penalties therefore [sic] and his constitutional rights in this case."

{¶ 59} Moreover, both the written plea and the plea colloquy contained representations by Fitzpatrick that he had spoken with his counsel and understood the charges against him. Fitzpatrick asserted that he had graduated from

high school and could read without any problem. He also agreed that he had talked to his attorneys about the case for "many, many hours." The written plea states: "I understand the nature of the charges against me in the Indictment and the possible defenses I might have," and "I understand the nature of the charges to which I plead guilty." During the colloquy, the presiding judge asked: "[D]o you understand the charges against you?" Fitzpatrick said, "Yes." The judge asked: "Do you want all or any part of any of the charges against you explained in any way?" Fitzpatrick said, "No."

{¶ 60} Fitzpatrick contends that, despite these representations, the record indicates that he had failed to understand the meanings of "prior calculation and design" and "purposeful." When he told the court that he wanted to plead guilty, Fitzpatrick stated: "I killed them, but I don't remember what happened to Doreatha and Shenay. I remember to [sic] Mr. Rose. He tried to beat me." In his penalty-phase unsworn statement, he said he "wouldn't knowingly hurt Doreatha or Shay [Shenay] like that." He further stated that he had hit Rose with the hatchet only after Rose had hit him and pulled a gun on him.

{¶ 61} In *State v. Swift,* 86 Ohio App.3d 407, 621 N.E.2d 513, the court of appeals invalidated a guilty plea because the defendant's statements at the plea hearing implied that he had failed to understand one of the elements of the crime to which he was pleading. *Swift* at 412–413, 621 N.E.2d 513. *Swift* held that in such a situation, the trial court was obligated to clear up the defendant's confusion. Id. at 413, 621 N.E.2d 513. See, also, *Libretti,* 516 U.S. at 51, 116 S.Ct. 356, 133 L.Ed.2d 271 (court should correct a defendant's "obvious confusion" about consequences of plea).

{¶ 62} Fitzpatrick's statements *denying* that he acted with purpose or prior calculation and design, however, do not necessarily imply a failure to *understand* those elements. See, generally, *North Carolina v. Alford* (1970), 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (upholding guilty plea of defendant who had denied his guilt while pleading guilty). Nor were Fitzpatrick's statements made during the plea hearing, as were the statements in *Swift.* Moreover, the record of the plea hearing contains express representations by Fitzpatrick and his counsel that the natures of the charges had been explained to him and that he understood them.

{¶ 63} Fitzpatrick's second proposition of law is overruled.

### III. Sentencing Issues

#### A. Gruesome Photographs

{¶ 64} In his third and fifth propositions of law, Fitzpatrick contends that the trial court erroneously considered gruesome photographs and video in the penalty phase. The photographs in question depict the corpses of Fitzpatrick's victims at the crime scene and during the autopsies. The video shows the victims at the

crime scene. The state originally introduced these items during the plea hearing. In the penalty phase, the state moved to readmit all the evidence that it had introduced during the plea hearing. However, the state asked the panel to consider "only * * * the evidence that pertains to the specifications, [which are] now the aggravating circumstances in this case." The defense announced that it had no objection, and the state's motion for readmission was granted.

{¶ 65} In his third proposition, Fitzpatrick claims that the photos and video had a prejudicial impact that outweighed their probative value, thus creating the possibility that the death sentence resulted from passion and prejudice. In his fifth proposition, he claims that the photos and video were irrelevant to the aggravating circumstances, and therefore should not have been readmitted in the penalty phase.

{¶ 66} Fitzpatrick's claims are waived by his failure to object to the readmission of the exhibits in the penalty phase. Nothing in the record indicates that the panel's sentencing decision was influenced by the emotional impact of the photos. Moreover, because the penalty phase was tried to a three-judge panel, it is presumed that "the court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary." *State v. White* (1968), 15 Ohio St.2d 146, 151, 44 O.O.2d 132, 239 N.E.2d 65; accord *State v. Post* (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754. Accordingly, Fitzpatrick cannot show that his sentence clearly would have been otherwise but for the alleged error.

{¶ 67} Consequently, the claims raised in Fitzpatrick's third and fifth propositions do not meet the plain-error standard. See, generally, *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240; *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. Applying the doctrine of waiver, we overrule Fitzpatrick's third and fifth propositions of law.

### B.   Sentencing Opinion

{¶ 68} In his sixth proposition of law, Fitzpatrick contends that the trial court's sentencing opinion fails to explain why the panel found that the aggravating circumstances outweighed the mitigating factors. We disagree.

{¶ 69} The opinion contains extensive discussion of the aggravating circumstances and the mitigating factors, as well as the following passage:

{¶ 70} "When weighing the aggravating circumstances as previously stated versus the mitigating factors which the Court noted and considered, the Court finds the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt separately as to Counts One, Two and Three.

{¶ 71} "A death penalty assessment is the ultimate resolution for the most serious of crimes. It is, as it should be, reserved only for the most heinous

aggravated murder cases and for the most vicious acts against common decency and mankind. In this case, Stanley L. Fitzpatrick qualifies in both respects."

{¶ 72} Fitzpatrick also contends that the trial court considered the nature and circumstances of the offense as a nonstatutory aggravating circumstance. The panel's discussion of the aggravating circumstances appears under the heading, "Facts Constituting Aggravating Circumstances." This may suggest that the panel believed that the circumstances of the murders were aggravating circumstances. If the panel so believed, it was in error. However, any such error in the trial court's sentencing opinion can be corrected by our independent review in Part VI, below. See *State v. Bey* (1999), 85 Ohio St.3d 487, 506, 709 N.E.2d 484. Fitzpatrick's sixth proposition is therefore overruled.

### C. Constitutionality of Child–Murder Aggravating Circumstance

{¶ 73} In his seventh proposition of law, Fitzpatrick contends that the child-murder aggravating circumstance set forth in R.C. 2929.04(A)(9) fails to narrow the class of offenders eligible for the death penalty (and hence violates the Eighth Amendment to the United States Constitution), because it merely restates the elements of the offense of aggravated murder as defined in R.C. 2903.01(C).

{¶ 74} R.C. 2903.01(C) provides: "No person shall purposely cause the death of another who is under thirteen years of age at the time of the commission of the offense." R.C. 2929.04(A)(9) creates an aggravating circumstance to an aggravated-murder charge if "[t]he offender, in the commission of the offense, purposefully caused the death of another who was under thirteen years of age at the time of the commission of the offense, *and* either the offender *was the principal offender* in the commission of the offense or, if not the principal offender, *committed the offense with prior calculation and design.*" (Emphasis added.)

{¶ 75} Contrary to Fitzpatrick's assertion, R.C. 2929.04(A)(9) does not simply restate the elements of R.C. 2903.01(C). Anyone who purposely kills a child younger than 13 violates R.C. 2903.01(C). But R.C. 2929.04(A)(9) applies to a narrower group: the offender can be convicted of an R.C. 2929.04(A)(9) specification only if he (1) *personally* kills the child (which makes him the "principal offender") or (2) kills the child with prior calculation and design. We used identical reasoning to uphold the constitutionality of the R.C. 2929.04(A)(7) felony-murder aggravating circumstance. *State v. Barnes* (1986), 25 Ohio St.3d 203, 206–207, 25 OBR 266, 495 N.E.2d 922.

{¶ 76} Moreover, even if the elements of the R.C. 2929.04(A)(9) aggravating circumstance were identical to the elements of aggravated murder set forth in R.C. 2903.01(C), R.C. 2929.04(A)(9) would not violate the Constitution. "[A]n aggravating circumstance may duplicate an element of the capital offense if the class of death-eligible defendants is sufficiently narrowed by the definition of the

offense itself." *Williams v. Taylor* (2000), 529 U.S. 362, 392, 120 S.Ct. 1495, 146 L.Ed.2d 389, fn. 16, citing *Lowenfield v. Phelps* (1988), 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568. See, also, *State v. Henderson* (1988), 39 Ohio St.3d 24, 29, 528 N.E.2d 1237; *Cooey v. Coyle* (C.A.6, 2002), 289 F.3d 882, 900–901. Fitzpatrick's seventh proposition is overruled.

## IV. Issues Precluded by Guilty Plea

{¶ 77} In his eighth, ninth, tenth, and eleventh propositions of law, Fitzpatrick raises issues pertaining to jury selection and the court's disposition of pretrial motions. However, Fitzpatrick pleaded guilty to the charges against him, and that plea precludes him from raising these issues.

{¶ 78} "[A] guilty plea * * * renders irrelevant those constitutional violations not logically inconsistent with the valid establishment of factual guilt and which do not stand in the way of conviction if factual guilt is validly established." *Menna v. New York* (1975), 423 U.S. 61, 62, 96 S.Ct. 241, 46 L.Ed.2d 195, fn. 2. Therefore, a defendant who, like Fitzpatrick, voluntarily, knowingly, and intelligently enters a guilty plea with the assistance of counsel "may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Tollett v. Henderson* (1973), 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235. See, also, *Ross v. Auglaize Cty. Common Pleas Court* (1972), 30 Ohio St.2d 323, 59 O.O.2d 385, 285 N.E.2d 25 (valid guilty plea by counseled defendant waives all nonjurisdictional defects in prior stages of proceedings); *State v. Spates* (1992), 64 Ohio St.3d 269, 271–273, 595 N.E.2d 351.

{¶ 79} Fitzpatrick's eighth, ninth, tenth, and eleventh propositions attack neither the trial court's jurisdiction to try the case nor the constitutionality of the statutes he violated. Compare *Menna v. New York*, supra (guilty plea does not preclude double-jeopardy claim); *State v. Wilson* (1979), 58 Ohio St.2d 52, 12 O.O.3d 51, 388 N.E.2d 745, paragraph one of the syllabus (guilty plea does not preclude attack on constitutionality of statute under which defendant was convicted). Nor do these propositions implicate the voluntary, knowing, and intelligent character of his guilty plea. See *State v. Kelley* (1991), 57 Ohio St.3d 127, 566 N.E.2d 658, paragraph two of the syllabus. Hence, that plea precludes Fitzpatrick from raising these issues on appeal. *Tollett,* supra; *Ross,* supra. Fitzpatrick's eighth, ninth, tenth, and eleventh propositions are therefore overruled.[1]

---

1. Furthermore, the issues raised in Fitzpatrick's eighth and ninth propositions, pertaining to juror selection, were waived by Fitzpatrick's jury waiver. His eighth proposition is also waived by his failure at trial to challenge any of the jurors in question for cause.

## V.  Settled Issues

{¶ 80} Fitzpatrick's twelfth proposition of law, a general Eighth Amendment attack on Ohio's statutes governing capital punishment, is overruled. See *State v. Jenkins* (1984), 15 Ohio St.3d 164, at 168–169, 171–172, 176–177, 178–179, 15 OBR 311, 473 N.E.2d 264; *State v. Buell* (1986), 22 Ohio St.3d 124, 138–139, 22 OBR 203, 489 N.E.2d 795; *State v. Steffen* (1987), 31 Ohio St.3d 111, 124–125, 31 OBR 273, 509 N.E.2d 383; *State v. Henderson* (1988), 39 Ohio St.3d 24, 528 N.E.2d 1237, paragraphs one and two of the syllabus; *State v. Mills* (1992), 62 Ohio St.3d 357, 372, 582 N.E.2d 972; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 417–418, 613 N.E.2d 212; *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668; *State v. Raglin* (1998), 83 Ohio St.3d 253, 261, 699 N.E.2d 482.  See, generally, *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus; *State v. Spisak* (1988), 36 Ohio St.3d 80, 521 N.E.2d 800.

## VI.  Independent Sentence Review

{¶ 81} In his fourth proposition of law, Fitzpatrick argues that the state failed to establish beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors.

{¶ 82} Under R.C. 2929.05, we must independently review the death sentence on each count of aggravated murder.  As to each count, we must determine (1) whether the evidence supports the panel's finding of an aggravating circumstance, (2) whether the aggravating circumstance outweighs the mitigating factors, and (3) whether the death sentence is proportionate to those affirmed in similar cases.

### A.  Aggravating Circumstances

{¶ 83} Each of the aggravated-murder counts carried one death specification. Count One (Shenay Hayes) had an R.C. 2929.04(A)(9) specification (victim under 13).   Count Two (Doreatha Hayes) had an R.C. 2929.04(A)(5) specification (multiple murder).   Count Three (Elton Rose) also had an R.C. 2929.04(A)(5) multiple-murder specification.

{¶ 84} These specifications were supported by sufficient evidence.  Fitzpatrick pleaded guilty to each one in open court.  Moreover, the evidence introduced at the plea hearing supported the specifications.

{¶ 85} State's Exhibit 10, the birth certificate of Shenay Hayes, proved that she was born on September 25, 1988, and thus was under 13 years of age when Fitzpatrick murdered her on June 7, 2001.   This established the R.C. 2929.04(A)(9) specification.

{¶ 86} The evidence also showed that Fitzpatrick killed Shenay and Doreatha Hayes inside 867 Chicago Avenue on June 7, 2001, and killed Elton Rose two

days later in the same house, and that each killing was purposely committed. Shenay was stabbed four times, strangled with a ligature, and struck hard enough to fracture her skull. Doreatha was beaten in the face with a hatchet wielded forcefully enough to fracture her skull. Elton Rose was struck on the head ten times with a blunt instrument. Thus, the evidence shows that beyond a reasonable doubt, the murders of Doreatha Hayes and Elton Rose were "part of a course of conduct involving the purposeful killing of * * * two or more persons by the offender." R.C. 2929.04(A)(5).

## B. Mitigating Factors

{¶ 87} The centerpiece of Fitzpatrick's case in mitigation was the testimony of Dr. Emmett Cooper, a psychiatrist who examined Fitzpatrick twice: first in October 2001 and again in January 2002, about two weeks before the penalty hearing. Dr. Cooper diagnosed Fitzpatrick as having a "[s]ubstance-induced psychotic disorder and major depression disorder with psychotic features." Dr. Cooper also concluded that Fitzpatrick had suffered from "acute cocaine intoxication" and "cocaine delirium during the alleged offenses."

{¶ 88} Cooper explained that chronic cocaine use can cause changes in the brain that may lead to hallucinations and delusions "even when one is not using." According to Cooper, such changes have taken place in Fitzpatrick's brain. A few months before the murders, Fitzpatrick began experiencing paranoia, delusions, and hallucinations, which are signs of a "thought disorder." This condition was Fitzpatrick's "baseline." Despite his substance-induced psychotic disorder, Fitzpatrick "was still able to function. More or less able to go to work, and to interact reasonably well." Cooper explained that some schizophrenics "have good reality testing." Even though they experience hallucinations, they know their hallucinations are not real.

{¶ 89} However, intoxication caused Fitzpatrick to lose his reality-testing ability. Intoxicated, Fitzpatrick could not tell his hallucinations from reality, and his hallucinations thus "drove his behavior."

{¶ 90} According to Cooper, Fitzpatrick was intoxicated at the time of the murders with cocaine, Valium, marijuana, beer, and benzodiazepines. Fitzpatrick was hallucinating at times, "go[ing] in and out of consensual reality," even though he was still "able to transact some social interactions" (e.g., buying more drugs). The level of drugs in his system at any given time "dictate[d] whether * * * he was more psychotic or more in a reality basis." In Cooper's opinion, at the time of the murders, intoxication rendered Fitzpatrick "acutely psychotic to about the top of his baseline" and caused him to commit the murders.

{¶ 91} Detective Dilbert was a defense witness in the penalty phase. He testified about statements that Fitzpatrick's cousin Marvin Thomas had made to investigators concerning Thomas's June 10, 2001 conversation with Fitzpatrick.

{¶ 92} According to Thomas, Fitzpatrick said that he had been "on a crack binge from Tuesday [June 5] to Thursday [June 7]." Fitzpatrick told his cousin that on June 7, he saw the Devil, who said he was "as real as God" and invited Fitzpatrick to touch him. Thomas said that Fitzpatrick had described the feeling as follows: "[T]he feeling was like when you put a sweeper up to your hand and it sucks your hand. He [Fitzpatrick] said he felt the hard suck, just like suck all his life out of his body."

{¶ 93} Dilbert also testified that Fitzpatrick had told him that "he had been smoking crack for several days, and that he had been up for several days." In Dilbert's opinion, Fitzpatrick's appearance was consistent with that statement.

{¶ 94} Fitzpatrick's co-worker Eric Mitchell testified about a conversation he had had with Fitzpatrick in the basement of 867 Chicago Avenue on the morning of June 9. Fitzpatrick had recently been suspended from his job at the Formica plant. Mitchell visited Fitzpatrick that morning to notify him to attend a meeting about his job status.

{¶ 95} Mitchell testified that Fitzpatrick told him that "he had been fighting against the devil, and felt like he had been fighting a thousand people." During the conversation, Fitzpatrick repeatedly interrupted Mitchell with claims that he heard people upstairs. He would then run upstairs, peep outside through the window blinds, then run back downstairs.

{¶ 96} Mitchell testified that Fitzpatrick had mentioned his hallucinations before June 9, on a few occasions when he was drinking or "high on pills." On those occasions, Fitzpatrick told Mitchell that "he felt somebody was following him" and that he was having blackouts. During the June 9 conversation, Mitchell noticed drug paraphernalia in the basement.

{¶ 97} In rebuttal, the state called Anita Nixon, a cousin of Doreatha Hayes. Nixon testified that she had telephoned Doreatha's house at approximately 9:00 a.m. on June 8, 2001—the day after Fitzpatrick had killed Shenay and Doreatha, and the day before he killed Rose. Fitzpatrick answered the phone, and he and Nixon talked for about ten minutes. Nixon described Fitzpatrick as speaking in a "normal * * * relaxed * * * pleasant" manner. In Nixon's opinion, Fitzpatrick did not sound intoxicated.

{¶ 98} Fitzpatrick instructed his counsel not to call certain witnesses, including family members, in mitigation. However, he did make an unsworn statement under R.C. 2929.03(D)(1). He stated: "I don't remember anything that happened with Shay [Shenay] or Doreatha. When I woke up I was at the bottom of the

steps leaning towards Doreatha's room. I was covered with blood." After finding their bodies, he took "a whole bunch of Valiums." He woke up the next morning and "got high some more," and then when he felt better, he "went over and got Mr. Rose."

{¶ 99} Fitzpatrick said that after he and Rose entered the house, he told Rose that he had done "something real bad to Doreatha," and Rose told him to call 911. Fitzpatrick claimed that as he called 911, Rose hit him in the back of the head and a struggle began. As they struggled, they both fell down the basement stairs and then Rose pointed a gun at Fitzpatrick. Fitzpatrick then hit Rose in the arm with the hatchet and then "kept hitting him, hitting him." (Fitzpatrick told a similar tale to Marvin Thomas the day after he killed Rose.)

{¶ 100} Fitzpatrick stated that he had then run outside. When he saw police, he went back inside, ran downstairs, and got Rose's gun. When he came back upstairs, a police officer (Sumler) was in the house. Fitzpatrick pointed the gun at him and said, "I don't want to kill you; I just want to leave." The officer ran, and Fitzpatrick fired "at the glass" in the door; he later claimed, "[The officer] was already out the door when I shot."

{¶ 101} Fitzpatrick said that he had fled in the police cruiser but had to abandon it when he "ran the car up into some bushes." When he ran past a store, a crowd of people grabbed him, and as he struggled to get free, the gun fell out of his pocket; upon seeing it, the crowd "scattered."

{¶ 102} Fitzpatrick admitted that he had entered Montika Pitts's house through an open door, but he denied that he had choked her. Fitzpatrick said that Pitts began screaming and pushing him against a door, while he merely tried to get away. He fled down the street, where he saw a lady (Marjorie Duff) getting out of her car. He admitted that he had pushed her out of his way and stolen her car, but denied that he had demanded her keys, which he claimed had been in the ignition.

{¶ 103} Fitzpatrick apologized for killing Doreatha and Shenay, and said that he "wouldn't knowingly do this to anybody."

{¶ 104} Fitzpatrick contends that the evidence establishes a mitigating factor under R.C. 2929.04(B)(3): "because of a mental disease or defect," Fitzpatrick "lacked substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law" at the time he murdered his victims.

{¶ 105} We agree. Dr. Cooper diagnosed Fitzpatrick as having a "[s]ubstance-induced psychotic disorder and major depression disorder with psychotic features." These disorders caused delusions, hallucinations, and paranoia. Cooper

testified that Fitzpatrick suffered from these disorders at the time of the murders and that they constituted a serious mental defect.

{¶ 106} Cooper gave no opinion as to whether Fitzpatrick lacked substantial capacity to appreciate the criminality of his conduct or to conform to the law. However, his testimony supports the inference that Fitzpatrick lacked substantial capacity. Not only did Fitzpatrick have hallucinations and delusions, but when intoxicated, he thought they were real, and they "drove his behavior." Moreover, Cooper believed that Fitzpatrick was intoxicated and "go[ing] in and out of * * * reality" at the time of the murders.

{¶ 107} Cooper rejected the suggestion that Fitzpatrick was malingering. Cooper acknowledged that Dr. Dunsieth, who had examined Fitzpatrick in the county jail, suspected malingering. But results of tests that Cooper gave Fitzpatrick were inconsistent with malingering. Moreover, Dr. Dunsieth himself had prescribed antipsychotic medication for Fitzpatrick, an act that is inconsistent with a diagnosis of malingering.

{¶ 108} Cooper's conclusions are consistent with Eric Mitchell's observations of Fitzpatrick. They are also consistent with Fitzpatrick's accusing Shenay Hayes and Elton Rose of having attacked or threatened him with deadly weapons.

{¶ 109} Furthermore, we disagree with the state's claim that Anita Nixon's testimony refuted Cooper's opinion. Nixon testified that Fitzpatrick had sounded calm and sober during their ten-minute telephone conversation on June 8. That is not inconsistent with Cooper's testimony that Fitzpatrick went "in and out of * * * reality" from June 7 through June 9, based on the level of drugs in his system. We therefore conclude that-Fitzpatrick has established, by a preponderance of the evidence, a mitigating factor under R.C. 2929.04(B)(3). See *State v. Stumpf* (1987), 32 Ohio St.3d 95, 102, 512 N.E.2d 598 (existence of mitigating factors must be established by preponderance of the evidence).

{¶ 110} However, we also find that, in this case, the R.C. 2929.04(B)(3) factor is entitled to little weight. Cooper's testimony shows that when sober, Fitzpatrick was "able to function," to interact socially, to work, and to engage in "reality testing." It was only when intoxicated that Fitzpatrick went "in and out of * * * reality." "[T]he drug levels [in his system] * * * at any point in time, would dictate whether or not he was more psychotic or more in a reality basis." And it was therefore "transient acute intoxication of cocaine, that [led] to his behaviors," as Cooper testified. In other words, Fitzpatrick's diminished capacity was caused, not by his mental disorder alone, but by his disorder when exacerbated by voluntary intoxication.

{¶ 111} Voluntary intoxication is at most a weak mitigating factor, entitled to little weight. See, e.g., *State v. D'Ambrosio* (1995), 73 Ohio St.3d 141, 145, 652 N.E.2d 710; *State v. Dennis* (1997), 79 Ohio St.3d 421, 436, 683 N.E.2d 1096;

*State v. Campbell* (2002), 95 Ohio St.3d 48, 51, 765 N.E.2d 334. Moreover, Cooper testified that Fitzpatrick's preexisting mental disorder was itself caused by his chronic cocaine use. A disorder both caused and exacerbated by the voluntary ingestion of drugs deserves minimal weight in mitigation.

{¶ 112} Fitzpatrick cites his "lack of a significant history of prior criminal convictions and delinquency adjudications," R.C. 2929.04(B)(5), as a mitigating factor. Fitzpatrick, who was 33 years old when he committed the murders, had only two blemishes on his record: a conviction for a drug-abuse offense and an ordinance violation for which he was fined $100. This factor is entitled to some weight.

{¶ 113} Fitzpatrick pleaded guilty to the charges against him, and in his unsworn statement, he expressed remorse, apologizing to the families of the victims. Finally, the record shows that Fitzpatrick had been employed at a Formica plant since 1996, although he was suspended not long before the murders. These factors are entitled to weight under R.C. 2929.04(B)(7). See *State v. Mink,* 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, at ¶ 125, 127.

{¶ 114} Other statutory mitigating factors are absent. In his June 10 confession to Marvin Thomas, Fitzpatrick claimed that Shenay had attacked him with a knife. He also told Thomas that Elton Rose had attacked him, a claim he also made in his unsworn statement. However, these claims are not credible, and Fitzpatrick does not argue that they constitute a mitigating factor.

{¶ 115} Each aggravated murder count carries a single aggravating circumstance, which must be separately weighed against the above mitigating factors. *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895, paragraph three of the syllabus. Count One carries a child-murder aggravating circumstance under R.C. 2929.04(A)(9). The law recognizes that "offenses against children are especially serious." *State v. Arnett* (2000), 88 Ohio St.3d 208, 216, 724 N.E.2d 793 (discussing R.C. 2929.12[B][1] ). The murder of a child is an especially reprehensible act; hence, the aggravating circumstance here deserves substantial weight.

{¶ 116} Against this, we weigh Fitzpatrick's diminished capacity at the time he committed the murders, but not much weight is given to his diminished capacity because it was induced by Fitzpatrick's voluntary substance abuse. Fitzpatrick's minimal criminal history is an important factor, and his showing of remorse is also significant. Nevertheless, we find that the aggravating circumstance outweighs the combined mitigating factors beyond a reasonable doubt.

{¶ 117} On Count Two, the aggravating circumstance is the fact that the murder was part of a course of conduct involving three murders. We have recognized that the course-of-conduct aggravating circumstance "carries great weight in aggravation." *State v. Hutton,* 100 Ohio St.3d 176, 2003-Ohio-5607, 797 N.E.2d 948, at ¶ 91. See, also, *State v. Hessler* (2000), 90 Ohio St.3d 108, 131, 734

N.E.2d 1237. We find that this aggravating circumstance outweighs the mitigating factors in this case beyond a reasonable doubt.

{¶ 118} Count Three also carries a course-of-conduct aggravating circumstance. On this count, the balance weighs even more strongly in favor of the death sentence than it does on Count Two. Fitzpatrick claimed that he had killed Doreatha after an argument, but he lured Rose to 867 Chicago Avenue in order to kill him. The nature and circumstances of this offense help explain why the course-of-conduct aggravating circumstance on Count Three outweighs the mitigating factors. See, generally, *State v. Stumpf*, 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus (proper for trial court to rely on the nature and circumstances of the offenses to support its finding that the aggravating circumstances outweigh the mitigating factors).

## C. Proportionality

{¶ 119} We have approved death sentences in two cases where the defendant was convicted of a child-murder specification under R.C. 2929.04(A)(9). See *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185; *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221. We find that the death sentence for Count One is not disproportionate.

{¶ 120} The death sentences for Counts Two and Three are also proportionate to death sentences approved in other cases. We have often approved death sentences when the only aggravating circumstance was a course of conduct under R.C. 2929.04(A)(5). In *State v. Allard* (1996), 75 Ohio St.3d 482, 663 N.E.2d 1277, the defendant had killed his ex-wife and daughter and had tried to kill his son. He suffered from mental disorders and expressed remorse. Id. at 502, 663 N.E.2d 1277. In *State v. Awkal* (1996), 76 Ohio St.3d 324, 667 N.E.2d 960, the defendant had killed two family members. He had no prior criminal history and had a history of mental problems. Id. at 339, 667 N.E.2d 960. In *State v. Clemons* (1998), 82 Ohio St.3d 438, 696 N.E.2d 1009, the defendant had killed three co-workers. He suffered from depression, had a history of drug abuse, expressed remorse, and had no criminal record. Id. at 455–456, 696 N.E.2d 1009. In *State v. Brooks* (1986), 25 Ohio St.3d 144, 25 OBR 190, 495 N.E.2d 407, the defendant had killed his three sons. He was mentally ill and under great stress, and had no criminal record. Id. at 155, 25 OBR 190, 495 N.E.2d 407.

{¶ 121} In each of the above cases, we approved the death sentence. We find that the death sentences on Counts Two and Three in this case are not disproportionate.

{¶ 122} Fitzpatrick's convictions, including the sentences of death, are affirmed.

*Judgment affirmed.*

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

O'DONNELL, J., concurs in judgment only.

———————

Michael K. Allen, Hamilton County Prosecuting Attorney, and Philip R. Cummings, Assistant Prosecuting Attorney, for appellee.

Faulkner & Tepe, L.L.P., and A. Norman Aubin; Fred Hoefle, for appellant.