DECISION.
{¶ 1} Petitioner-appellant Stanley Fitzpatrick appeals the denial of his petition for postconviction relief. He advances on appeal four assignments of error, in which he contends that the common pleas court erred in denying his postconviction claims, in refusing to afford him discovery to develop the claims, and in declining to conduct an evidentiary hearing. Finding no merit to any aspect of these challenges, we affirm the judgment of the common pleas court.
 {¶ 2} In June of 2001, the Hamilton County Grand Jury returned a seven-count indictment charging Fitzpatrick with three counts of aggravated murder for the deaths of his girlfriend, her daughter, and a neighbor; with attempted murder and aggravated robbery for shooting at, and then stealing the cruiser of, a police officer; with aggravated burglary for breaking into the home of, and then assaulting, a second woman; and with aggravated robbery for wielding a knife to steal the car of a third woman. Fitzpatrick initially entered not-guilty pleas to all charges, and the case proceeded to a trial before a jury. But following defense counsel's opening statement, Fitzpatrick, against the advice of his counsel, stopped the trial, withdrew his not-guilty pleas, signed a jury waiver, and entered guilty pleas to all charges. The trial court discharged the jury, and following a plea hearing, a three-judge panel accepted Fitzgerald's guilty pleas and found him guilty as charged.[1] Based upon the evidence adduced at the mitigation hearing, the panel imposed a sentence of death for each aggravated-murder count and an aggregate sentence of twelve years on the remaining counts.
 {¶ 3} Fitzpatrick appealed his convictions to the Ohio Supreme Court. On July 7, 2004, the supreme court affirmed.[2] While his direct appeal was pending, Fitzpatrick filed with the common pleas court his postconviction petition. With his petition, he filed motions for discovery and for funds to employ drug-addiction and pharmacology experts. The common pleas court denied the petition without reference to the motions and without an evidentiary hearing.
 I. THE DENIAL OF FITZPATRICK'S POSTCONVICTION CLAIMS {¶ 4} Fitzpatrick contends in his first assignment of error that the common pleas court erred in denying his postconviction claims without an evidentiary hearing. This challenge is untenable.
 {¶ 5} To prevail on a postconviction claim, the petitioner must demonstrate a denial or infringement of his rights in the proceedings resulting in his conviction that rendered the conviction void or voidable under the Ohio Constitution or the United States Constitution.[3] In advancing such a claim, the petitioner bears the initial burden of demonstrating, through the petition and any supporting affidavits and the files and records of the case, "substantive grounds for relief."[4]
 {¶ 6} A postconviction claim is subject to dismissal without a hearing if the petitioner has failed to submit with his petition evidentiary material setting forth sufficient operative facts to demonstrate substantive grounds for relief.[5]
Conversely, "the court must proceed to a prompt hearing on the issues" if "the petition and the files and records of the case show the petitioner is * * * entitled to relief."[6]
 {¶ 7} Fitzpatrick argues in support of his first assignment of error that the common pleas court erred in applying the doctrine of res judicata to bar the bulk of his claims. "Under the doctrine of res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding[,] except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial [that] resulted in that judgment of conviction or on an appeal from that judgment."[7] Thus, a common pleas court may apply the doctrine of res judicata to dismiss a postconviction claim only if the claim presents a matter that could fairly have been determined without resort to evidence dehors the record.[8]
 {¶ 8} Fitzpatrick offered outside evidence in support of each of his fourteen claims for relief. A postconviction petitioner may resist dismissal of a postconviction claim under the doctrine of res judicata by supporting his claim with evidence outside the record. But submitting outside evidence will not, by itself, preclude the common pleas court from applying the doctrine of res judicata to deny the claim. The outside evidence must be "competent, relevant and material" to the claim; it must "meet some threshold standard of cogency," i.e., it must be more than "marginally significant"; and it must "advance the * * * claim beyond mere hypothesis and a desire for further discovery."[9] Moreover, such evidence must be other than cumulative of or alternative to the evidence presented at trial.[10] And it "must be more than evidence [that] was in existence and available to the defendant at the time of trial and which could and should have been submitted at trial if the defendant wished to make use of it."[11] Finally, submitting outside evidence in support of a postconviction claim will not preclude the application of the doctrine of res judicata to deny the claim if the claim could fairly have been determined on direct appeal from the judgment of conviction, based upon the materials contained in the trial record.[12]
 {¶ 9} Finally, Fitzpatrick predicated the bulk of his postconviction claims upon the Sixth Amendment guarantee of the effective assistance of counsel. To prevail on a claim of ineffective assistance of defense counsel, a postconviction petitioner must demonstrate (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced him.[13] Trial counsel's performance will not be deemed ineffective unless the petitioner shows that "counsel's representation fell below an objective standard of reasonableness,"[14] and that "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different."[15]
 A. Restraint by a Stun Belt and Shackles {¶ 10} In his first claim for relief, Fitzpatrick contended that his restraint at trial by shackles and an electronic immobilization belt, or "stun belt," had violated his rights to a fair trial, due process, the presumption of innocence, and the effective assistance of counsel. In his sixth claim, he contended that his trial counsel had been ineffective in failing to request removal of the restraints or to request a hearing on the need for restraints.
 {¶ 11} Prior to trial, Fitzpatrick filed a "Motion to Appear at All Proceedings Without Restraints." The defense sought by the motion to dissuade the trial court from ordering that Fitzpatrick be restrained by shackles, arguing that his appearance in shackles would, prior to trial, taint the pool of prospective jurors and would, during trial, deny him the presumption of innocence. At a hearing on the motion, the trial court declined the state's invitation to leave the decision to Hamilton County Sheriff's Office personnel, noting that the law demanded that a criminal accused "not * * * be seen in restraints unless there [was] a situation that he ha[d] to be in restraints." The court then granted the motion upon its determination that Fitzgerald's appearance without restraints was "appropriate," "[a]s long as [he] behav[ed] in a fashion that complie[d] with the sheriff's security needs."
 {¶ 12} After a jury had been empanelled and counsel had made their opening statements, defense counsel approached the bench and advised the trial court that Fitzpatrick, during the state's opening statement, had demanded that he be permitted to plead guilty and had persisted in this demand despite counsel's explanation that he would still be eligible for the death penalty. The court took a recess, urging further discussions between counsel and Fitzpatrick. When court reconvened, Fitzpatrick remained steadfast in his desire to plead guilty, asserting that the decision was his, and that he did not want to put his family through a trial. When the court stated its inclination to proceed with the trial, Fitzpatrick demanded to be removed from the courtroom so that he would not have to listen to any more "lies" about his role in the murders, and his increasing agitation prompted the court to warn him not to "mess with" the sheriff's deputies. Again, the court ordered a recess.
 {¶ 13} When court again reconvened, defense counsel changed their course, now advocating that Fitzpatrick be permitted to plead guilty and to be absent from further proceedings. The court, citing its concern with preserving Fitzpatrick's right to be present, stated that it was "inclin[ed]" to have him remain in the courtroom, provided that he "behave[d] and conduct[ed] [him]self in a proper manner." Fitzpatrick responded, "Your Honor, how can I do that? I have got 50,000 volts attached to me. I have got this guy playing with the remote control. * * * I'm shackled up, man. I already look bad to the jury." Upon further inquiry by the trial court, Fitzpatrick confirmed that he "could not conduct himself in a proper manner," and that he "would be disruptive" and "might * * * * cause [himself] to jeopardize the safety of the participants in the trial as well as the [sheriff's] deputies," if the court compelled him to attend further proceedings. The court then, "for the protection of all involved, as well as the order of the proceedings * * * in th[e] courtroom," granted Fitzpatrick's request not to be present.
 {¶ 14} Fitzpatrick returned to the courtroom to enter his guilty pleas and for the penalty phase of his trial. The record does not disclose whether he was restrained during those proceedings by a stun belt. But it does show that, during each proceeding, the three-judge panel acceded to his request that his handcuffs be loosened from the ring that secured them to a belt at his waist.
 {¶ 15} Fitzpatrick offered in support of his first and sixth postconviction claims copies of records from the Hamilton County Justice Center that showed that he had not been violent while incarcerated. He also submitted a copy of an instruction manual that the sheriff's office had issued to its Court Services Division, outlining the purposes and uses of the stun belt, and a notification form signed by Fitzpatrick eight months before his trial, advising him of the sheriff's requirement that he wear the belt, the circumstances under which the belt might be activated, and the consequences of its activation. And he provided the affidavit of an attorney certified in capital litigation, whose review of the record of the trial proceedings prompted him to opine that Fitzpatrick's counsel had violated their duty to their client and had "prohibited him from assisting in his own defense" by "fail[ing] to insist on the removal of the stun belt" and by "allow[ing] him to remain restrained by the stun belt."
 {¶ 16} Placing restraints on a criminal defendant during his trial violates the Sixth Amendment if the restraints impede the defendant's ability to confer with counsel or to assist in his defense. And the use of restraints infringes upon the presumption of innocence if the restraints can be said to have affected how the defendant was perceived by those charged with determining his guilt.[16]
 {¶ 17} The decision to restrain the defendant is committed to the sound discretion of the trial court.[17] But the court, having been granted the authority, and thus been charged with the responsibility, to determine the need for restraints, may not delegate that responsibility to law enforcement authorities.[18] And the court's exercise of its discretion is subject to certain guiding principles. Thus, the violent nature of the crimes for which a defendant is being tried will not alone justify the use of restraints.[19] Moreover, restraints may be employed only under "unusual circumstances,"[20] only as a "last resort,"[21] and only when justified "by an essential state interest specific to each trial."[22] Finally, a court may use restraints only when, upon consideration of "the [defendant's] actions both inside and outside the courtroom, as well as his demeanor while court is in session," it finds that restraints are necessary for the safe, reasonable, and orderly progress of the trial, such as when a defendant presents a danger of violence or escape.[23]
 {¶ 18} A hearing on the need for restraints is "the preferred and encouraged practice," because it serves to facilitate meaningful appellate review. But a hearing is not mandatory, and with or without a hearing, a trial court's exercise of its discretion to use restraints may not be disturbed on appeal if the record discloses "facts and circumstances surrounding [the] defendant [that] illustrate a compelling need to impose exceptional security procedures * * *."[24]
 1. Restraint during the guilt phase of trial {¶ 19} As a general rule, a criminal defendant who has been convicted upon a voluntary, knowing, and intelligent plea of guilty waives any claimed deprivation of constitutional rights that occurred before he entered his plea.[25] In the direct appeal, the Ohio Supreme Court applied this rule to hold that Fitzpatrick's "voluntar[y], knowing, and intelligent" guilty pleas precluded him from raising unspecified "issues pertaining to jury selection and the * * * disposition of pretrial motions."[26] Thus, by his guilty pleas, Fitzpatrick waived the challenges presented in his first and sixth postconviction claims to his restraint during the guilt phase of his trial, except to the extent that the challenges could be said to have "implicate[d] the voluntary, knowing, and intelligent character of his guilty plea[s]."[27]
 {¶ 20} The record of the proceedings at trial showed that the trial court had conducted a hearing on, and had granted, Fitzpatrick's pretrial motion to appear without restraints, but that Fitzpatrick had nevertheless been restrained with a stun belt and shackles during opening statements. In discussing with the trial court his request to plead guilty, Fitzpatrick conveyed his discomfort with the stun belt and shackles and his sense that the restraints had caused the jury to prejudge him. Thus, the record provided an evidentiary basis for Fitzpatrick's first postconviction claim, to the extent that the claim may be read to allege that his guilty pleas were the involuntary product of his restraint by shackles and a stun belt in the presence of the jury, and to his sixth claim, to the extent that the claim may be read to allege that his guilty pleas were the involuntary product of counsel's failure to insist on removal of the restraints or on a hearing.
 {¶ 21} Of the outside evidence submitted in support of these claims, we note that the justice-center records and the stun-belt instruction manual and notification form were all available to the defense at the time of Fitzpatrick's trial. And the attorney's affidavit constituted, in essence, a "notarized argument" that could have been presented at trial or on appeal. Thus, the outside evidence did not preclude the application of the doctrine of res judicata to bar the first claim.[28]
And based on the evidence of record, Fitzpatrick could have raised at trial or in the appeal of his convictions to the Ohio Supreme Court a claim that his guilty pleas had been the involuntary product of his restraint by shackles and a stun belt. We, therefore, hold that his first postconviction claim, to the extent of its challenge to the voluntary nature of his guilty pleas, was subject to dismissal under the doctrine of res judicata.[29]
 {¶ 22} The doctrine of res judicata was also dispositive of that aspect of Fitzpatrick's sixth postconviction claim that could be read to charge that his guilty pleas were the involuntary product of his counsel's failure to insist on removal of the restraints or on a hearing. New counsel represented Fitzpatrick in his direct appeal to the Ohio Supreme Court. And his claim that his guilty pleas had been the involuntary product of his counsel's ineffectiveness could fairly have been determined in that appeal, based on information contained in the trial record. We, therefore, hold that the doctrine of res judicata barred Fitzpatrick from advancing in his postconviction petition that aspect of his sixth claim.[30]
 2. Restraint during the penalty phase of trial {¶ 23} Fitzpatrick did not, by his guilty pleas, waive the challenges presented in his first and sixth postconviction claims to his restraint during the penalty phase of his trial. While a challenge to his restraint during the penalty phase did not implicate the presumption of innocence, it did implicate theSixth Amendment right to the effective assistance of counsel and the Sixth Amendment and due-process rights to be present at trial and to participate in one's defense.
 {¶ 24} With respect to the trial's penalty phase, the record showed that Fitzpatrick had provided the trial court with a reason to impose restraints when, in his exchange with the court concerning his guilty pleas, he had confessed to an inability to restrain himself. The record did not contain, and Fitzpatrick did not submit in support of his claims, evidence demonstrating that his appearance in restraints during the penalty phase of his trial had infringed upon his right to be present at trial or his right to participate in his defense. Nor did Fitzpatrick demonstrate a reasonable probability that, but for his counsel's failure to request removal of the restraints or a hearing on the need for restraints, the results of the penalty phase of the trial would have been different.[31]
 {¶ 25} Thus, Fitzpatrick failed to provide in support of the challenges to his restraint during the penalty phase of trial evidentiary material setting forth sufficient operative facts to demonstrate substantive grounds for relief. Accordingly, the first and sixth claims were, in this final respect, subject to dismissal.[32]
 {¶ 26} We, therefore, hold that the common pleas court properly denied Fitzpatrick's first and sixth postconviction claims.
 B. Competency {¶ 27} In his second, third, and fourth claims for relief, Fitzpatrick contended that the trial court's failure to conduct a competency hearing to determine the knowing, intelligent, and voluntary nature of his speedy-trial waiver, his jury waiver, and his guilty pleas denied him due process and a fair trial. In his fifth, seventh, and eighth claims, he charged that his trial counsel's failure to insist on a competency hearing to determine the knowing, intelligent, and voluntary nature of his waivers and pleas denied him the effective assistance of counsel.
 {¶ 28} The record disclosed that a month after Fitzpatrick's indictment, during a pretrial conference to set a date for trial, Fitzpatrick's counsel had stated that, in consultation with their client and in contemplation of the time needed to prepare for trial, they wished to waive on his behalf his statutory right to a speedy trial. When his counsel asked Fitzpatrick to confirm to the trial court that he understood the proceedings, Fitzpatrick shook his head. He also responded in the negative to the trial court's inquiry into whether he was "all right." But he responded affirmatively to the court's ensuing inquiry into his understanding of his speedy-trial rights and his counsel's need for time to prepare his defense, and he acknowledged that he had signed the entry waiving time. The trial court, upon its determination that the waiver was "appropriate," set the trial date beyond the statutory period.
 {¶ 29} The court then proceeded directly to an in-chambers "discussion * * * in regards to * * * the possibility of a suggestion of incompetence being filed." During this "discussion," the police officer who had led the murder investigation appeared under subpoena by the defense. The officer testified that the police had interviewed Fitzpatrick's cousin, to whom Fitzpatrick had confided that his actions had been provoked by cocaine and "the Devil." This statement, the officer asserted, had caused him to alert the prosecution to the "possib[ility]" that the defense might make an issue of Fitzpatrick's competency. The officer also related that, during his exchange with Fitzpatrick during the booking process, Fitzpatrick had "seemed able to make intelligent decisions" and had "seemed aware of what was going on." The defense requested no further action on the matter, and the "discussion" concluded.
 {¶ 30} At the close of opening statements, during his colloquy with the trial court, Fitzpatrick grew quite animated in his demand that he be permitted to plead guilty. He confessed that he remembered "what [had] happened" with his neighbor, but stated, "I killed them, but I don't remember what happened to [his girlfriend] Doreatha or [her daughter] Shenay."
 {¶ 31} After a recess, the court resumed the proceedings to record the substance of an out-of-court discussion concerning Fitzpatrick's competency. At his request, Fitzpatrick was not present. Counsel stated that, because their review of Fitzpatrick's psychiatric records and their conversations with two psychiatrists and a psychologist had revealed no "indicia" of incompetence, they "intend[ed] to [pursue his request to] withdraw his plea[s] of not guilty and enter plea[s] of guilty" and, "to facilitate that, * * * to enter a jury waiver."
 {¶ 32} Fitzpatrick then returned to the courtroom. He had signed a jury waiver. And in his colloquy with the trial court, as the Ohio Supreme Court noted in its decision, he had "confirmed that he had not been subjected to duress and that he had read the waiver form, [had] discussed his decision with counsel, and had no questions. He [had] affirmed that he had signed the waiver voluntarily and that he wanted to waive his right to a jury trial and have the case tried to a three-judge panel. [His] counsel [had] informed the court that Fitzpatrick had taken a medication that `help[ed] him actually to think more clearly and to sleep better.' Fitzpatrick [had] stated that the medication did not interfere with his ability to understand the waiver form or the proceedings."[33] Two days later, the three-judge panel, following a hearing in compliance with Crim.R. 11, accepted Fitzpatrick's guilty pleas and, upon the evidence presented at a hearing pursuant to R.C. 2945.06, found him guilty of all charges and specifications.
 {¶ 33} Fitzpatrick submitted in support of his postconviction claims outside evidence in the form of visitor logs from the Hamilton County Justice Center, his medical records while incarcerated there, and the affidavit of his capital-litigation expert. Fitzpatrick offered the visitor and medical records to show that, following the proceeding in which he had waived his speedy-trial right, he had asked to see a psychiatrist; that he had subsequently been prescribed medicine, the types and dosages of which had been continuously adjusted throughout the proceedings leading to his jury waiver and pleas; and that the psychiatrists upon which counsel had relied in concluding that he was competent to waive a jury trial and to plead guilty had not based their opinions of his mental state on current clinical assessments. This evidence, he asserted, coupled with the evidence of record, demonstrated that the trial court and defense counsel had been aware of issues concerning his competency to waive his speedy-trial and jury rights and to enter guilty pleas. Thus, he contended, counsel had incurred a duty to request, and the court had incurred a duty to conduct, a hearing into the matter.
 1. The trial court's failure to conduct a hearing {¶ 34} Again, this outside evidence did not preclude application of the doctrine of res judicata to bar the challenges presented in Fitzpatrick's second, third, and fourth claims. The visitor and medical records were available to the defense at the time of Fitzpatrick's trial, and the attorney's affidavit was essentially a "notarized argument" that could have been made at trial or on appeal.[34] Thus, Fitzpatrick could have presented at trial or on appeal a challenge to the trial court's failure to conduct a competency hearing to determine the knowing, intelligent, and voluntary nature of his speedy-trial and jury waivers and his guilty pleas. We, therefore, hold that his second, third, and, fourth claims were subject to dismissal under the doctrine of res judicata.[35]
 2. Defense counsel's failure to insist on a hearing {¶ 35} The outside evidence submitted by Fitzpatrick did preclude application of the doctrine of res judicata to bar the challenges presented in his fifth, seventh, and eighth postconviction claims to his trial counsel's effectiveness in failing to insist on a competency hearing to determine the knowing, intelligent, and voluntary nature of his speedy-trial and jury waivers and his guilty pleas.[36] But the claims were subject to dismissal on other grounds.
 {¶ 36} In his direct appeal to the Ohio Supreme Court, Fitzpatrick did not challenge the knowing, intelligent, and voluntary nature of his waiver of his right to a speedy trial. He did, on appeal, unsuccessfully challenge the knowing, intelligent, and voluntary nature of his guilty pleas, but on grounds other than competency.
 {¶ 37} The supreme court also rejected Fitzpatrick's challenge to the voluntary nature of his jury waiver, holding that he had failed to overcome the presumption, raised by his written waiver, that he had voluntarily relinquished his right to a jury trial. In so holding, the court found nothing in the record to contradict Fitzpatrick's statement during the jury-waiver proceedings that his medication had not "interfered with his ability to understand the [jury] waiver form or the proceedings." The court also noted that Fitzpatrick's "decision to waive a jury trial [had] followed from his decision to plead guilty," and that the record made "clear * * * that his decision to plead guilty [had been] voluntary[,] [when] Fitzpatrick [had] initiated that decision, [had] insisted upon it against advice of counsel, and [had] held to it through a lengthy plea colloquy."[37]
 {¶ 38} The record of the proceedings at trial confirmed defense counsel's need for substantial preparation time and disclosed rational reasons for Fitzpatrick's waiver of a trial before a jury. Nothing in the outside evidence offered in support of the fifth, seventh, and eighth claims demonstrated a reasonable probability that, but for counsel's failure to insist on, or to secure, a competency hearing, Fitzpatrick would not have waived his speedy-trial or jury rights or pleaded guilty or would have been found incompetent to do so.[38] Thus, Fitzpatrick failed to sustain his initial burden of demonstrating substantive grounds for relief. Accordingly, we conclude that the common pleas court properly denied Fitzpatrick's fifth, seventh, and eighth claims.[39]
 C. Ineffective Assistance of Counsel During the Penalty Phase of Trial {¶ 39} In claims for relief nine through twelve, Fitzpatrick contended that he had been denied the effective assistance of counsel by his trial counsel's inadequate and incompetent investigation, preparation, and presentation of his case in mitigation.
 1. Mitigation specialist {¶ 40} We address together Fitzpatrick's ninth, tenth and eleventh claims. In his eleventh claim, he assailed his counsel's effectiveness in failing to avail themselves of the funds granted by the trial court to secure the services of a mitigation specialist. Specifically, he argued that a mitigation specialist would have instructed counsel in the use of his employment and jail records and would have directed counsel to secure the services of a mental-health professional to assist in preparing and presenting in mitigation his psychological, medical, and social histories. His ninth and tenth claims similarly charged that counsel had inadequately assembled and presented evidence to prove in mitigation that he had been gainfully employed and could adjust to incarceration.
 {¶ 41} The record disclosed that less than a month before Fitzpatrick's trial was scheduled to begin, the defense had filed a motion requesting funds to employ as a mitigation specialist one James F. Crates. The next day, the defense moved for a continuance for a variety of reasons, including the fact that the date set for trial presented "scheduling problems" for Crates and other mitigation investigators whom counsel had sought to employ. The trial court granted the continuance and authorized funding for and the appointment of Crates to serve as the defense's mitigation specialist.
 {¶ 42} In an affidavit offered in support of Fitzpatrick's ninth, tenth, and eleventh claims, Crates averred that, after the court had settled upon the new trial date, he had warned defense counsel of a "possible conflict" with the new date. This conflict ultimately limited Crates's assistance on the case to a single day. In the course of that day, he did not speak to Fitzpatrick, but spoke with three potential mitigation witnesses, reviewed the case files, and advised counsel "about issues that [had] quickly [become] apparent to [him]." Specifically, Crates pointed to witness statements concerning Fitzpatrick "hearing voices and acting bizarre." Crates found these statements to suggest that Fitzpatrick had "mental health issues that [the defense's psychiatric expert,] Dr. [Emmett] Cooper[,] was not exploring," and that Fitzpatrick "might be psychotic from another standpoint." Crates thus suggested to counsel that a "psychologist * * * with a neuropsychological specialty get involved," "to conduct a full clinical and neuropsychological battery of tests" and to provide "a dual diagnosis, not solely looking at the crack cocaine effects on [Fitzpatrick]."
 {¶ 43} Fitzpatrick also submitted in support of his claims outside evidence in the form of his justice-center records, the affidavit of his capital-litigation expert, his employment records, and correspondence from defense counsel to his former employer requesting the records. Crates averred in his affidavit that counsel had provided him with neither the justice-center records nor the employment records. If they had, he asserted, he would have recommended that counsel provide the records to the defense's mentalhealth expert, and that they introduce the records at trial in support of the relevant mitigating factors.
 {¶ 44} Crates conceded that he did not know what, if any, action defense counsel had taken on his suggestions. But he asserted that he had perceived defense counsel to be "dismissive" of his efforts to engage them in "a cooperative psycho-social history inquiry."
 a. Intoxication {¶ 45} The Ohio Supreme Court in the direct appeal concluded, upon its independent review of Fitzpatrick's death sentences, that the aggravating circumstances outweighed the mitigating circumstances.[40] The court provided in its decision the following summary of the psychiatric testimony presented by the defense in mitigation:
 {¶ 46} "The centerpiece of Fitzpatrick's case in mitigation was the testimony of Dr. Emmett Cooper, a psychiatrist who examined Fitzpatrick twice: first in October 2001 and again in January 2002, about two weeks before the penalty hearing. Dr. Cooper diagnosed Fitzpatrick as having a `[s]ubstance-induced psychotic disorder and major depression disorder with psychotic features.' Dr. Cooper also concluded that Fitzpatrick had suffered from `acute cocaine intoxication' and `cocaine delirium during the alleged offenses.'
 {¶ 47} "Cooper explained that chronic cocaine use can cause changes in the brain that may lead to hallucinations and delusions `even when one is not using.' According to Cooper, such changes have taken place in Fitzpatrick's brain. A few months before the murders, Fitzpatrick began experiencing paranoia, delusions, and hallucinations, which are signs of a `thought disorder.' This condition was Fitzpatrick's `baseline.' Despite his substance-induced psychotic disorder, Fitzpatrick `was still able to function. More or less able to go to work, and to interact reasonably well.' Cooper explained that some schizophrenics `have good reality testing.' Even though they experience hallucinations, they know their hallucinations are not real.
 {¶ 48} "However, intoxication caused Fitzpatrick to lose his reality-testing ability. Intoxicated, Fitzpatrick could not tell his hallucinations from reality, and his hallucinations thus `drove his behavior.'
 {¶ 49} "According to Cooper, Fitzpatrick was intoxicated at the time of the murders with cocaine, Valium, marijuana, beer, and benzodiazepines. Fitzpatrick was hallucinating at times, `go[ing] in and out of consensual reality,' even though he was still `able to transact some social interactions' (e.g., buying more drugs). The level of drugs in his system at any given time `dictate[d] whether * * * he was more psychotic or more in a reality basis.' In Cooper's opinion, at the time of the murders, intoxication rendered Fitzpatrick `acutely psychotic to about the top of his baseline' and caused him to commit the murders."[41]
 {¶ 50} R.C. 2929.04(B) required the three-judge panel to "consider, and weigh against the [proved] aggravating circumstances" certain mitigating factors, including "[w]hether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law."[42] The panel "assign[ed] little weight" to this factor, based upon Dr. Cooper's testimony that "it was Mr. Fitzpatrick's self-induced acute cocaine intoxication that [had] led to his behavior in these offenses."
 {¶ 51} The supreme court, in conducting its independent review, also found that "the evidence establishe[d] a mitigating factor under R.C. 2929.04(B)(3): `because of a mental disease or defect,' Fitzpatrick `lacked substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law' at the time he murdered his victims."[43] And the supreme court followed a line of reasoning similar to that followed by the three-judge panel to conclude that the factor carried "little weight":
 {¶ 52} "Cooper's testimony shows that when sober, Fitzpatrick was `able to function,' to interact socially, to work, and to engage in `reality testing.' It was only when intoxicated that Fitzpatrick went `in and out of * * * reality.' `[T]he drug levels [in his system] * * * at any point in time, would dictate whether or not he was more psychotic or more in a reality basis.' And it was therefore `transient acute intoxication of cocaine, that [led] to his behaviors,' as Cooper testified. In other words, Fitzpatrick's diminished capacity was caused, not by his mental disorder alone, but by his disorder when exacerbated by voluntary intoxication.
 {¶ 53} "Voluntary intoxication is at most a weak mitigating factor, entitled to little weight. [Citations omitted.] [And] Cooper testified that Fitzpatrick's preexisting mental disorder was itself caused by his chronic cocaine use. A disorder both caused and exacerbated by the voluntary ingestion of drugs deserves minimal weight in mitigation."[44]
 {¶ 54} Fitzpatrick failed to submit in support of his eleventh claim evidence that he had, as the mitigation specialist had suspected, acted under something other than a voluntary "[s]ubstance-induced psychotic disorder." Thus, he failed to demonstrate a reasonable probability that, but for his counsel's failure to employ a mitigation specialist, the R.C. 2929.04(B)(3) mitigating factor would have been assigned such weight as to compel the conclusion that the aggravating factors did not outweigh the mitigating factors.[45] Because Fitzpatrick failed to sustain his initial burden of demonstrating substantive grounds for relief, we conclude that the common pleas court properly denied this aspect of his eleventh claim.[46]
 b. Gainful employment and ability to adapt to incarceration {¶ 55} Fitzpatrick's ninth and tenth claims and the remaining aspects of his eleventh claim challenged his counsel's effectiveness in failing to secure the services of a mitigation expert to assist in assembling, and then presenting, mitigating evidence of his gainful employment and his ability to adjust to incarceration. In the direct appeal, the Ohio Supreme Court specifically found that Fitzpatrick's employment record was a factor to be weighed against the aggravating circumstances in determining whether he should be sentenced to death.[47]
But again, the evidence offered in support of these claims did not demonstrate a reasonable probability that, but for counsel's failure to employ a mitigation specialist to assist in assembling such evidence, or but for counsel's failure to offer such evidence, these mitigating factors would have been assigned such weight as to compel the conclusion that the aggravating factors did not outweigh the mitigating factors.[48] And, again, Fitzpatrick's failure to demonstrate substantive grounds for relief leads us to conclude that the common pleas court properly denied his ninth and tenth claims and the relevant aspects of his eleventh claim.[49]
 2. Addiction expert {¶ 56} In his twelfth claim, Fitzpatrick contended that he had been denied the effective assistance of counsel by his counsel's failure to employ an "addiction" expert. Such an expert, he asserted, would have helped the three-judge panel to understand that Fitzpatrick's drug addiction had destroyed his ability to voluntarily choose to use or not to use drugs.
 {¶ 57} In support of this claim, Fitzpatrick submitted outside evidence in the form of the affidavit of his capital-litigation expert, a photocopy of a portion of a mentaldisorders manual that provided the American Psychiatric Association's definition of substance dependency, and a photocopy of a research report on drug abuse and addiction. He also submitted an undated transcript of testimony in an unspecified proceeding by a doctor certified in "addictions medicine" that appears to have been offered by another capital defendant in support of a postconviction challenge to his trial counsel's effectiveness in failing to consult an addiction expert.
 {¶ 58} The Ohio Supreme Court assigned the R.C. 2929.04(B)(3) diminishedcapacity factor "little weight" upon its determination that Fitzpatrick had "voluntar[ily]" undertaken the "chronic cocaine use" that had "both caused and exacerbated" the "preexisting mental disorder" under which he had operated when he had committed the murders. Fitzpatrick failed to submit in support of his twelfth claim evidence that his ingestion of drugs had been other than voluntary. Thus, he failed to demonstrate a reasonable probability that, but for his counsel's failure to employ an addiction expert, the R.C. 2929.04(B)(3) mitigating factor would have been assigned such weight as to compel the conclusion that the aggravating factors did not outweigh the mitigating factors.[50] Fitzpatrick again failed to sustain his initial burden of demonstrating substantive grounds for relief. Therefore, the common pleas court properly denied his twelfth claim.[51]
 D. The Constitutionality of Lethal Injection
In his thirteenth claim for relief, Fitzpatrick challenged the constitutionality of the state's use of lethal injection as a means of execution. In affirming Fitzgerald's convictions in his direct appeal, the Ohio Supreme Court overruled his "generalEighth Amendment attack on Ohio's statutes governing capital punishment."[52] And the supreme court specifically held inState v. Carter[53] that execution by lethal injection does not run afoul of the Eighth Amendment's proscription against cruel and unusual punishment. We, therefore, hold that the common pleas court properly denied Fitzpatrick's thirteenth claim.
 E. The Constitutionality of the Postconviction Statutes {¶ 59} In his fourteenth claim for relief, Fitzpatrick contended that the postconviction statutes provided an "inadequate corrective process." Specifically, he charged that the statutes contravened the Fifth, Sixth, Eighth, Ninth, andFourteenth Amendments to the United States Constitution and Sections 1, 2, 5, 9, 10, 16, 20, and 39, Article I, of the Ohio Constitution, because they did not permit discovery in the initial stages of a postconviction proceeding, because they imposed a three-page limit for each postconviction claim, and because they had provided relief to only one capital defendant since 1982.
 {¶ 60} As we noted supra, R.C. 2953.21(A)(1) requires a postconviction petitioner to demonstrate a denial or infringement of his rights that occurred in the proceedings resulting in hisconviction and that rendered the conviction void or voidable
under the state or federal constitution.[54] The constitutional deprivations asserted by Fitzpatrick in his fourteenth claim did not occur during the proceedings resulting in his convictions. And a determination that the postconviction statutes were constitutionally infirm would not have rendered his convictions void or voidable. We, therefore, conclude that the common pleas court properly denied the fourteenth claim for relief.
 F. Conclusion {¶ 61} Having thus concluded that the common pleas court properly denied each of Fitzpatrick's postconviction claims, we hold that the court properly dismissed his petition. Accordingly, we overrule his first assignment of error.
 II. DISCOVERY
In his second assignment of error, Fitzpatrick asserts that the common pleas court erred in denying his petition without affording him the opportunity to conduct discovery. In his third assignment of error, he also challenges the court's refusal to permit discovery, contending that the court erred when it "overruled" his motions for funds to retain pharmacological and drug-addiction experts to aid him in developing his postconviction claims. We find no merit to either challenge.
As we noted supra, the common pleas court denied Fitzpatrick's petition without reference to his motions for discovery and for expert funding. But we construe the court's entry denying the petition as an implicit denial of these discovery requests.[55]
We have long held that the postconviction statutes do not contemplate discovery in the initial stages of a postconviction proceeding.[56] We have also held that the failure of the statutes to so provide does not contravene any state or federal constitutional right.[57] Thus, Fitzpatrick was entitled to discovery to develop his claims and to experts to aid in that discovery only if the petition and its supporting evidentiary material demonstrated substantive grounds for relief.[58]
Upon our determination that the common pleas court properly denied Fitzpatrick's postconviction claims without an evidentiary hearing, we conclude that the court properly declined to afford him discovery or the funding for experts to aid in discovery. Accordingly, we overrule the second and third assignments of error.
 III. CUMULATIVE ERROR
In his fourth assignment of error, Fitzpatrick contends that the cumulative effect of the claimed errors requires this court to reverse the common pleas court's judgment or to remand the case to that court for "an adequate postconviction proceeding." An appellate court may reverse a judgment of conviction when the cumulative effect of errors deemed separately harmless denies the defendant a fair trial.[59] By its terms, the doctrine of "cumulative error" will not provide a basis for reversal in the absence of multiple errors.[60] We have discerned no error in the common pleas court's dismissal of Fitzpatrick's claims or in the court's refusal to afford him discovery to develop those claims. We, therefore, overrule the fourth and final assignment of error.
 IV. CONCLUSION
Finding no merit to any of the challenges presented on appeal, we affirm the judgment of the common pleas court.
Judgment affirmed.
Winkler, P.J., Gorman and Sundermann, JJ.
[1] R.C. 2945.06 provides that "[i]f the accused pleads guilty of aggravated murder, a court composed of three judges shall examine the witnesses, determine whether the accused is guilty of aggravated murder or any other offense, and pronounce sentence accordingly."
[2] See State v. Fitzpatrick, 102 Ohio St.3d 321,2004-Ohio-3167, 810 N.E.2d 927.
[3] See R.C. 2953.21(A)(1); State v. Powell (1993),90 Ohio App.3d 260, 264, 629 N.E.2d 13.
[4] See R.C. 2953.21(C).
[5] See id.; State v. Pankey (1981), 68 Ohio St.2d 58, 59,428 N.E.2d 413; State v. Jackson (1980), 64 Ohio St.2d 107,413 N.E.2d 819, syllabus.
[6] R.C. 2953.21(E).
[7] State v. Perry (1967), 10 Ohio St.2d 175, 226 N.E.2d 104, paragraph nine of the syllabus.
[8] See id.; State v. Cole (1982), 2 Ohio St.3d 112, 114,443 N.E.2d 169.
[9] State v. Coleman (Mar. 17, 1993), 1st Dist. No. C-900811.
[10] See State v. Combs (1995), 100 Ohio App.3d 90, 98,652 N.E.2d 205.
[11] State v. Coleman, supra.
[12] See State v. Cole, 2 Ohio St.3d 112, 443 N.E.2d 169, syllabus; State v. Perry, 10 Ohio St.2d 175, 226 N.E.2d 104, paragraph nine of the syllabus.
[13] See Strickland v. Washington (1984), 466 U.S. 668, 694,104 S.Ct. 2052; State v. Bradley (1989), 42 Ohio St.3d 136,538 N.E.2d 373.
[14] Strickland v. Washington, 466 U.S. 668, 688,104 S.Ct. 2052.
[15] State v. Bradley, 42 Ohio St.3d 136, 143,538 N.E.2d 373.
[16] See State v. Leonard, 1st Dist. No. C-030492,2004-Ohio-3323, at ¶ 44 (citing Coffin v. United States [1895],156 U.S. 432, 453, 15 S.Ct. 394, Illinois v. Allen [1970],397 U.S. 337, 344, 90 S.Ct. 1057, and State v. Franklin,97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, at ¶ 79).
[17] See State v. Richey (1992), 64 Ohio St.3d 353, 358,595 N.E.2d 915.
[18] See State v. Frazier, 1st Dist. Nos. C-030571 and C-030572, 2004-Ohio-4108.
[19] See State v. Leonard, supra at ¶ 50 (quoting Florida v.Miller [Fla.App. 2003], 852 So.2d 904, for the proposition that "allowing the charges of violence for which [a defendant was standing] trial to justify the use of restraint devices [was] circular reasoning that offend[ed] the presumption of innocence
and [hence the defendant's] right to a fair trial").
[20] State v. Franklin, 97 Ohio St.3d 1, 2002-Ohio-5304,776 N.E.2d 26, at ¶ 79.
[21] Illinois v. Allen, 397 U.S. at 344, 90 S.Ct. 1057.
[22] Holbrook v. Flynn (1986), 475 U.S. 560, 568-569,106 S.Ct. 1340.
[23] State v. Franklin, 97 Ohio St.3d 1, 2002-Ohio-5304,776 N.E.2d 26, at ¶ 79-80; accord State v. Leonard, supra at ¶ 45, 47, 48; see, also, United States v. Brooks (C.A.7, 1997),125 F.3d 484, 502 (holding that the risk of prejudice inherent in restraints also entitles a defendant to the minimum restraints necessary and to the least obvious ones).
[24] State v. Franklin, 97 Ohio St.3d 1, 2002-Ohio-5304,776 N.E.2d 26, at ¶ 82.
[25] See State v. Fitzpatrick, 102 Ohio St.3d 321,2004-Ohio-3167, 810 N.E.2d 927, at ¶ 77 (quoting Menna v. NewYork [1975], 423 U.S. 61, 62, 96 S.Ct. 241, fn. 2, for the proposition that "a guilty plea * * * renders irrelevant those constitutional violations not logically inconsistent with the valid establishment of factual guilt and which do not stand in the way of conviction if factual guilt is validly established"). The court also acknowledged certain exceptions to this rule, inapplicable here, that would preserve for appeal a challenge to a jurisdictional defect, see State v. Spates (1992),64 Ohio St.3d 269, 271-273, 595 N.E.2d 351, a claim of double jeopardy, see Menna v. New York, 423 U.S. 61, 96 S.Ct. 241, and a challenge to the constitutionality of the statute under which the defendant had been convicted. See State v. Wilson (1979),58 Ohio St.2d 52, 388 N.E.2d 745, paragraph one of the syllabus.
[26] State v. Fitzpatrick, 102 Ohio St.3d 321,2004-Ohio-3167, 810 N.E.2d 927, at ¶ 77-79.
[27] See id. at ¶ 79.
[28] See State v. Bies (June 30, 1999), 1st Dist. No. C-980688; Coleman, supra.
[29] See State v. Perry, 10 Ohio St.2d 175, 226 N.E.2d 104, paragraph nine of the syllabus.
[30] See State v. Cole, 2 Ohio St.3d 112, 443 N.E.2d 169, syllabus; State v. Perry, 10 Ohio St.2d 175, 226 N.E.2d 104, paragraph nine of the syllabus.
[31] See State v. Bradley, 42 Ohio St.3d at 143,538 N.E.2d 373.
[32] See R.C. 2953.21(C); State v. Pankey,68 Ohio St.2d at 59, 428 N.E.2d 413; State v. Jackson, 64 Ohio St.2d 107,413 N.E.2d 819, syllabus.
[33] State v. Fitzpatrick, 102 Ohio St.3d 321,2004-Ohio-3167, 810 N.E.2d 927, at ¶ 36.
[34] See State v. Bies, supra; Coleman, supra.
[35] See State v. Perry, 10 Ohio St.2d 175, 226 N.E.2d 104, paragraph nine of the syllabus.
[36] See State v. Cole, 2 Ohio St.3d at 114, 443 N.E.2d 169.
[37] State v. Fitzpatrick, 102 Ohio St.3d 321,2004-Ohio-3167, 810 N.E.2d 927, at ¶ 39-41.
[38] See State v. Bradley, 42 Ohio St.3d at 143,538 N.E.2d 373; see, also, State v. Xie (1992), 62 Ohio St.3d 521, 524,584 N.E.2d 715 (quoting Hill v. Lockhart [1985], 474 U.S. 52,59, 106 S.Ct. 366, for the proposition that a defendant seeking to withdraw his guilty plea on the ground that it was the involuntary product of his counsel's deficient performance must demonstrate "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial"); accord State v. Blackwell (1998), 1st Dist. No. C-970150.
[39] See State v. Pankey, 68 Ohio St.2d at 59,428 N.E.2d 413; State v. Jackson, 64 Ohio St.2d 107, 413 N.E.2d 819, syllabus.
[40] See R.C. 2929.05(A).
[41] State v. Fitzpatrick, 102 Ohio St.3d 321,2004-Ohio-3167, 810 N.E.2d 927, at ¶ 87-90.
[42] R.C. 2929.04(B)(3).
[43] Id. at ¶ 104.
[44] Id. at ¶ 110-111.
[45] See State v. Bradley, 42 Ohio St.3d at 143,538 N.E.2d 373; see, also, R.C. 2929.03(D)(3).
[46] See State v. Pankey, 68 Ohio St.2d at 59,428 N.E.2d 413; State v. Jackson, 64 Ohio St.2d 107, 413 N.E.2d 819, syllabus.
[47] See State v. Fitzpatrick, 102 Ohio St.3d 321,2004-Ohio-3167, 810 N.E.2d 927, at ¶ 113 (citing R.C.2929.04[B][7]).
[48] See State v. Bradley, 42 Ohio St.3d at 143,538 N.E.2d 373; see, also, R.C. 2929.03(D)(3).
[49] See State v. Pankey, 68 Ohio St.2d at 59,428 N.E.2d 413; State v. Jackson, 64 Ohio St.2d 107, 413 N.E.2d 819, syllabus.
[50] See State v. Bradley, 42 Ohio St.3d at 143,538 N.E.2d 373; see, also, R.C. 2929.03(D)(3).
[51] See State v. Pankey, 68 Ohio St.2d at 59,428 N.E.2d 413; State v. Jackson, 64 Ohio St.2d 107, 413 N.E.2d 819, syllabus.
[52] State v. Fitzpatrick, 102 Ohio St.3d 321,2004-Ohio-3167, 810 N.E.2d 927, at ¶ 80.
[53] 89 Ohio St.3d 593, 608, 2000-Ohio-172, 734 N.E.2d 345.
[54] See State v. Powell, 90 Ohio App.3d at 264,629 N.E.2d 13.
[55] See State v. Hawkins (June 26, 1996), 1st Dist. No. C-950130.
[56] See State v. Zuern (Dec. 4, 1991), 1st Dist. Nos. C-900481 and C-910229; accord State v. Byrd (2001),145 Ohio App.3d 318, 332-333, 762 N.E.2d 1043.
[57] See State v. Jones (Dec. 29, 2000), 1st Dist. No. C-990813.
[58] See State v. Issa, 1st Dist. No. C-000793, 2001-Ohio-3910.
[59] See State v. DeMarco (1987), 31 Ohio St.3d 191,509 N.E.2d 1256, paragraph two of the syllabus.
[60] See State v. Madrigal (2000), 87 Ohio St.3d 378, 398,721 N.E.2d 52 (holding that "in order even to consider whether `cumulative error' is present, [a court] would first have to find that multiple errors were committed in th[e] case").