DECISION.
{¶ 1} Defendant-appellant Ronald E. Rose appeals his convictions for two counts of gambling,[1] one count of money laundering,[2] and one count of engaging in a pattern of corrupt activity,[3] all felonies. After a bench trial, the trial court sentenced Rose to a total of two years in prison and stayed the sentence pending this appeal. We affirm.
 I. Instant Bingo Games {¶ 2} In late 2000, Rose contacted Reverend John Wright, an old friend and business associate. Rose offered to help Wright set up instant bingo booths to generate money for Wright's church, the Bethel African Episcopal Church. Rose told Wright that Wright needed to secure documentation from the IRS to establish that the church was a nonprofit organization, and that once that was done, the instant booths could be legally operated and the church would benefit from the profits.
 {¶ 3} Rose told Wright that he had several locations in mind for the instant bingo booths and that he could "get everything set up and rolling." One location was in Springdale and the other on Colerain Avenue. (Rose eventually opened up a third store in Norwood, but he was acquitted of the gambling charge associated with that location.)
 {¶ 4} Rose told Wright that he knew how to order the instant tickets that patrons would buy, and that he had some people in mind to run the stores. According to Wright, he and Rose agreed that Rose would be the one to make sure everything was running properly, since Rose had experience running gambling operations. Rose also offered to help fund the startup costs, and the men agreed that Rose would eventually be paid back from the funds generated by the instant booths.
 {¶ 5} Evidence at trial demonstrated that Rose contacted the owner of the Springdale location and inquired about leasing the property. Rose was a witness on the lease signed by Wright. Rose also paid the first month's rent for the Springdale location, beginning in February 2001, and the security deposit. He also paid the March and April rent. In addition, Rose negotiated with the property owner to buy furniture specifically designed for a gambling operation, which had been left in the store by the previous renters.
 {¶ 6} Evidence also showed that Rose contacted the owner of the property on Colerain and helped to negotiate the lease. The property owner testified that Rose had the "final decision" on the terms of the lease. An associate of Rose paid the first month's rent, and Rose later repaid the associate.
 {¶ 7} Evidence demonstrated that Rose personally recruited workers to volunteer at the stores. Bob Zielman testified that Rose asked him to manage the Springdale store. Rose also bought advertising in Reach Magazine for both the Springdale and the Colerain stores.
 {¶ 8} Wright testified that he was concerned that his congregation, mostly seniors, would not approve of gambling as a way to make money for the church. He stated that he mentioned it to a "couple board members," but admitted he did not have official approval from the entire board to engage in the activity. He said that he decided to agree to the venture and to wait until later, when the church would receive some of the profits, to tell the entire church board about it. Despite the lack of official church approval, Wright obtained 501(C)(3) documentation from the IRS and posted it in all three locations.
 {¶ 9} Wright testified that Rose had told him that the church would receive $500 a week. Wright had "no idea what a booth would generate," so $500 a week sounded reasonable to him. When asked where any profit over $500 a week would go, Wright testified that Rose was to be repaid whatever money he had spent in setting up the stores. When asked if Rose was entitled to keep any money beyond what Rose had spent to set up the stores, Wright testified, "If there was extra or whatever, then I would have had no problem because of the amount that was promised to the church, and I know you wouldn't be doing all this for free."
 II. Where Did the Money Go? {¶ 10} The Springdale store operated from January 2001 until June 2001, and the Colerain store operated from March 2001 until June 2001.
 {¶ 11} Wright testified that the church did not receive any money from the venture. Wright repeatedly asked Rose about the promised money, but each time Rose told him that the startup costs and expenses left no money to pay out as profit.
 {¶ 12} Lieutenant William Fields and Detective Jim Grindle, Springdale police officers, testified that their investigation of an anonymous tip led them to visit the Springdale store set up by Rose. The officers eventually obtained a search warrant. Police raided and shut down the Springdale store at the end of June 2001, and they raided the Colerain store in July 2001.
 {¶ 13} Fields testified that he calculated the approximate income generated by each of the stores and created two charts to demonstrate the financial information. Fields explained that he subpoenaed the purchase records from Multi-State Bingo, the supplier of the instant games for all three stores. From the records, Fields could determine the number and types of instant games the stores bought and how much was paid for them.
 {¶ 14} From the material seized by police at the stores, Fields was able to calculate the total amount that would have been generated if every ticket of each game had been sold. Fields also determined, game-by-game, the expected payout for winners, and then the expected profit for the store, again assuming every ticket had been sold at face value.
 {¶ 15} Fields calculated that the Springdale store generated $185,702 in total gross sales. After accounting for paying off winning tickets, Fields calculated the profit for the store to be $42,962. For the Colerain store, Fields calculated the total gross sales to be $162,828 and the profit to be $37,364. Under the ideal conditions of every ticket sold at face value, the two stores together would have generated a profit of over $80,000.
 {¶ 16} Fields admitted that his calculations were, at best, an approximation of what money the stores had generated. Several factors could have made each store's actual profits lower or higher than Fields's calculations.
 {¶ 17} First, Fields testified that unsold tickets were confiscated at the stores. If they were unsold, obviously the stores could not have profited from those tickets. Fields testified that the unsold tickets for the Springdale store were valued at $15,912. For the Colerain store, the value of the unsold tickets was $19,294. Fields's chart included a column in which he deducted these amounts from the respective total gross sales figures. But it was not possible to accurately calculate the effect of these unsold tickets on the amount of profit for each store.
 {¶ 18} Second, Fields acknowledged that workers at the stores had said that they would sometimes sell tickets at a discount, either to get people started or to help sell out a particularly slow-selling game. If some tickets were sold at a discount, obviously the stores would not have profited as much as Fields had calculated. In addition, Fields admitted that it was possible that a store worker could have taken money from a store's cash register, especially given the large sums of cash handled at the stores.
 {¶ 19} While these factors would have undercut the amount of profit calculated by Fields, another factor indicated that Fields's profit calculations might have been too low. Fields testified that the police found numerous used tickets from games that were not in the purchase records from Multi-State Bingo. The stores had obviously purchased these other games, sold the tickets, and presumably made some profit from them. That profit was not accounted for in Fields's calculations, as he based his calculations only on the games purchased from Multi-State.
 III. Sufficiency and Manifest Weight {¶ 20} In his first three assignments of error, Rose argues that the trial court erred when it denied his Crim.R. 29 motion for acquittal, that his convictions were based on insufficient evidence, and that his convictions were against the manifest weight of the evidence.
 {¶ 21} In criminal cases, the legal concepts of sufficiency of the evidence and weight of the evidence are distinct.[4]
A challenge to the sufficiency of the evidence attacks the adequacy of the evidence presented. Whether the evidence is legally sufficient to sustain a conviction is a question of law.[5] The relevant inquiry in a claim of insufficiency is whether any rational factfinder, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proved beyond a reasonable doubt.[6]
 {¶ 22} A challenge to the weight of the evidence attacks the credibility of the evidence presented.[7] When evaluating the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.[8] The discretionary power to reverse should be invoked only in exceptional cases "where the evidence weighs heavily against the conviction."[9]
 {¶ 23} Rose was convicted of two counts of gambling, a violation of R.C. 2915.02(A)(2). The statute reads, "No person shall * * * [e]stablish, promote, or operate or knowingly engage in conduct that facilitates any game of chance conducted for profit or any scheme of chance."
 {¶ 24} In Rose's indictment, the state mistakenly placed the word "knowingly" in front of "establish, promote, or operate" when citing the statute. Rather than drafting a new indictment, the state agreed at trial to bear the extra burden of proving what the indictment claimed — that Rose had knowingly established, promoted, operated, or engaged in conduct facilitating a game of chance conducted for profit.
 {¶ 25} Rose does not seriously dispute that he helped to organize and establish the instant bingo games at the Springdale and Colerain stores. Substantial evidence indicated that Rose not only initiated the idea of generating money for the church through instant bingo games, but also picked out the store locations and secured leases for them, helped to pay the rent, helped to supply instant tickets from a distributor, and recruited volunteers to work in both stores.
 {¶ 26} Rose instead argues that his actions were within the exception in the statute for charitable gambling. Under R.C.2915.02(D)(1), the prohibition against gambling does not apply when the games of chance are conducted by a charitable organization and "[a]ll of the money or assets received from the games of chance after deduction only of prizes paid out during the conduct of the games of chance are used by, or given, donated, or otherwise transferred to" the charitable organization.
 {¶ 27} The charitable-gambling exception is an affirmative defense.[10] Therefore, Rose had the burden of proof to show, by a preponderance of the evidence, that the exception was established.[11]
 {¶ 28} Rose devotes much of his argument to the assertion that he did not know that Wright had not secured official church approval to use the church as the charitable organization benefiting from the instant booths. That may or may not have been so — we believe that Rose was entitled to rely on Wright's own approval. But Rose's attempt to fit his actions into the charitable-gambling exception still falls short when he cannot explain why the church never received any money.
 {¶ 29} Lieutenant Fields testified that, under the ideal conditions that every ticket ordered from Multi-State Bingo was sold at face value, the combined profit of the two stores should have been more than $80,000. Yet Wright testified that the church did not receive even one cent from the venture.
 {¶ 30} Rose challenges Fields's calculations as speculative and flawed. Fields himself admitted in his testimony that his calculations were "what should have occurred" if all the tickets bought from Multi-State were sold at face value. The actual profits generated by the stores could have been higher or lower than his calculations.
 {¶ 31} But we conclude that the state presented sufficient evidence to prove that the stores realized at least some
profit. The Springdale store was open for about six months, and the Colerain store for four months. By all accounts, the money spent on rent, utilities, and supplies for the stores was not unreasonable. Workers at the stores were not paid anything for their time (why these people would work for nothing to support a church they had never been to escapes us). Yet, according to Rose, not a single penny of profit was generated by the stores.
 {¶ 32} The burden was on Rose to prove, by a preponderance of the evidence, that all the profits generated by the instant booths were given to the church. We conclude that there was sufficient evidence for the factfinder, viewing the evidence in a light most favorable to the state, to have found that Rose had failed to establish that all the profits were given to the church, and that, therefore, Rose had failed to establish the charitable exception. We also conclude that there was sufficient evidence for the factfinder to have found that Rose had knowingly established, promoted, operated, or engaged in conduct that facilitated a game of chance.
 {¶ 33} Therefore, the evidence presented was legally sufficient to sustain Rose's convictions for gambling.
 {¶ 34} Rose was also convicted of money laundering and engaging in a pattern of corrupt activity. The statute for money laundering states, "No person shall conduct or attempt to conduct a transaction with the purpose to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of corrupt activity."[12] A "transaction" includes any purchase, sale, loan, gift, deposit, or payment.[13] A violation of R.C. 2915.02, the statute prohibiting gambling, is defined as "corrupt activity."[14]
 {¶ 35} The statute for engaging in a pattern of corrupt activity states, "No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity * * *."[15] A "pattern of corrupt activity" is defined as "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event."[16]
 {¶ 36} The state's evidence demonstrated that Rose had conducted numerous transactions with the purpose to establish and carry on a corrupt activity, specifically the instant bingo booths. The state's evidence also showed that Rose had conducted this corrupt activity with Wright and others in two separate locations. We conclude that a rational factfinder could have found that the state had proved beyond a reasonable doubt that Rose had committed the offenses of money laundering and engaging in a pattern of corrupt activity.
 {¶ 37} In addition, our review of the record does not persuade us that the trial court, as the finder of fact, clearly lost its way or created a manifest miscarriage of justice in finding Rose guilty of two counts of gambling, money laundering, and engaging in a pattern of corrupt activity. Therefore, the convictions were not against the manifest weight of the evidence.
 {¶ 38} Accordingly, we overrule Rose's first three assignments of error.
 IV. Admissible Evidence {¶ 39} In his fourth assignment of error, Rose argues that the trial court erred when it allowed the state to admit into evidence the charts prepared by Lieutenant Fields. The two charts created by Fields summarized his calculations concerning the sales and profits generated at each of the stores.
 {¶ 40} Rose contends that the charts contained speculative and flawed information. He claims that by calculating the income generated and the respective profit earned when an entire box of tickets was sold at face value, the charts were inapplicable to the case. In addition, he argues that Fields's testimony concerning the charts assumed facts not in evidence and should not have been admissible.
 {¶ 41} Evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant evidence and is ordinarily admissible.[17]
 {¶ 42} The charts showing calculations of sales and profits made at the two stores based on the purchase records were clearly relevant information. Rose claimed that the stores generated no profit, yet Fields and the charts demonstrated that substantial profits were realized at the stores.
 {¶ 43} Fields acknowledged that his figures were not entirely correct. He testified about the factors that could have affected his calculations, making the profit figures either too high or too low. But his testimony and the charts indicated that substantial money was generated at the stores by the instant bingo games. This was a key fact for the state to prove to counter Rose's argument that there were no profits to turn over to the church.
 {¶ 44} In addition, Rose had the opportunity to cross-examine Fields and to question how he had created the charts. The extent to which Fields's testimony and the charts presented reliable information was for the trier of fact to determine. But the charts and Fields's testimony were admissible evidence — Rose's objections go to the weight to be given the evidence, not to its admissibility. The weight was for the trial court to consider, and we believe that it was in the best position to determine the import of the evidence. Therefore, we overrule Rose's fourth assignment of error.
 V. Blakely {¶ 45} In his fifth and sixth assignments of error, Rose argues that his jury waiver was invalid and that, under Blakelyv. Washington,[18] the sentence imposed by the trial court violated his right to a trial by jury.
 {¶ 46} In Blakely, the United States Supreme Court held that a trial court cannot enhance a penalty beyond the statutory maximum based on any factors other than those on which the jury has found the defendant guilty. Rose claims that the minimum sentence that the trial court could have imposed on him was community control, and that because he received a prison sentence, the trial court "enhanced" his penalty without a jury making any findings.
 {¶ 47} We are not persuaded by Rose's arguments. First, Rose waived his right to a jury. A jury waiver must be voluntary, knowing, and intelligent.[19] There is nothing in the record to suggest that Rose's waiver was not made voluntarily, knowingly, and intelligently. And while the trial court did not specifically inform Rose that his right to a jury included the right to have a jury make the findings that would allow his penalty to be increased beyond the statutory maximum, the absence of this particular statement did not invalidate his jury waiver.
 {¶ 48} Second, this court has held that a minimum sentence is not a "statutory maximum."[20] Therefore, Blakely was not implicated where the sentence imposed in this case was within the statutory range authorized by law.[21] In Rose's case, with four felony convictions, a prison sentence was presumed. Rose actually received the shortest prison sentence possible for each conviction, and all four sentences were made concurrent. Because his penalty was not increased beyond the statutory maximum, Rose's right to a trial by jury was not violated.
 {¶ 49} Therefore, we overrule Rose's fifth and sixth assignments of error and affirm the trial court's judgment.
Judgment affirmed.
Doan, P.J., and Gorman, J., concur.
[1] R.C. 2915.02(A)(2).
[2] R.C. 1315.55(A)(3).
[3] R.C. 2923.32.
[4] See State v. Thompkins, 78 Ohio St.3d 380, 386,1997-Ohio-52, 678 N.E.2d 541.
[5] Id.
[6] See State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus.
[7] See State v. Thompkins, supra, at 387.
[8] See id.; State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
[9] See State v. Martin, supra.
[10] See State v. VFW Post 431, 2nd Dist. No. 19892, 2004-Ohio-3566, at ¶ 25; FOE Aerie 3998 v. Liquor ControlComm., 10th Dist. No. 03AP-909, 2004-Ohio-3308, at ¶ 10.
[11] Id.
[12] R.C. 1315.55(A)(3).
[13] R.C. 1315.51(L).
[14] R.C. 2923.31(I)(2)(c).
[15] R.C. 2923.32(A)(1).
[16] R.C. 2923.31(E).
[17] Evid. R. 401 and 402.
[18] Blakely v. Washington (2004), ___ U.S. ___,124 S.Ct. 2531.
[19] Crim.R. 23; State v. Fitzpatrick, 102 Ohio St.3d 321,2004-Ohio-3167, 810 N.E.2d 927, at ¶ 37.
[20] See State v. Eckstein, 1st Dist. No. C-030139,2004-Ohio-5059, at ¶ 22.
[21] See id. at ¶ 26; see, also, State v. Bell, 1st Dist. No. C-030726, 2004-Ohio-3621, at ¶ 42; State v. Monford, 1st Dist. No. C-030606, 2004-Ohio-5616, at ¶ 18.